[No. S033440. Feb. 17, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
VICENTE FIGUEROA BENAVIDES, Defendant and Appellant.

72

### Counsel

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, under appointments by the Supreme Court, and Kent Barkhurst, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Carlos A. Martinez and Kelly E. Lebel, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BROWN, J.**—A jury found defendant Vicente Figueroa Benavides guilty of the murder of Consuelo Verdugo (Pen. Code, § 187),[1] finding that he committed the murder under the special circumstances of felony-murder rape, felony-murder sodomy, and felony-murder lewd conduct (§ 190.2, subd. (a)(17)(C), (D), (E)). The jury also found defendant guilty of rape, sodomy, and lewd conduct (§§ 261, former subd. (2), 286, former subd. (c), 288, subd. (a)) against Consuelo, and that he inflicted great bodily injury in the commission of the sodomy and lewd conduct (§ 12022.8). At the penalty phase the jury fixed the punishment for the murder at death. The trial court rendered judgment accordingly. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. Facts

### A. *Guilt Phase Evidence*

#### 1. *The People's Case*

The prosecution presented evidence showing that defendant raped, sodomized, and fatally injured 21-month-old Consuelo Verdugo while babysitting her.

On November 17, 1991, at 7:30 p.m., Consuelo's mother, Estella Medina, brought her into the emergency room at the Delano Medical Center (DMC) and reported that Consuelo was hit by or had run into a door and injured her head. Consuelo was limp and flaccid, but responsive to outside stimuli in that she withdrew from pain and was moving her arms and legs. The only external signs of trauma were abrasions on her forehead. Medical personnel were concerned about a possible head injury, and the initial examination did not include a complete rectal or vaginal examination. They noted slight redness on the inside genitalia at the outer portion of the vagina, and that something obstructed their efforts to insert a catheter.

Within an hour Consuelo's stomach began to distend. Her blood pressure fell and her breathing became labored as she fell into a coma. Suspecting internal injuries, doctors transferred her to the Kern County Medical Center.

The transporting paramedic reported that Medina said Consuelo had run into a steel door while chasing her older sister Christina Medina, age nine.

---

[1] Hereafter, all statutory references are to the Penal Code unless otherwise specified.

The emergency room charge nurse found this explanation unsatisfactory because Consuelo had blown pupils, a condition normally related to the blunt trauma of a car accident, and there were no abrasions or contusions on her body to indicate such an accident had occurred. The nurse attempted to insert a catheter and discovered a "massive" hematoma,[2] or bruise, to the external genitalia, and a tear from the urethra at the top of the external genitalia to the vaginal opening. Eventually a small rubber feeding tube was inserted as a catheter.

Consuelo's abdomen soon became very distended. The emergency room physician noted severe swelling throughout the entire anal area, and "absolutely no rectal tone." He suspected Consuelo had been sexually abused, but did not conduct a complete sexual abuse examination because her condition was critical and her resuscitation was his main concern.

Consuelo was taken to surgery at midnight. The pediatric surgeon found recent internal injuries in the midline section of the abdomen. All of the central organs—the bowel, duodenum, and pancreas—had been compressed and were "cracked in half" with portions lying over both sides of the spine, and there were injuries to the colon. The surgeon thought these injuries were caused by a kick or punch. He noted scarring and signs of prior injuries, one to two months old, in the area between the colon and the liver.

A pediatrician with an expertise in child endangerment examined Consuelo the following morning. He found a tear in her hymen and a bruise of the perineum. The anus was markedly swollen and gaping. There were tears in the anal sphincter and damage to the sphincter muscles caused by the insertion of some object into the anus and resulting in the loss of sphincter tone. The loss of sphincter tone, the pediatrician concluded, was not caused by the surgery. There was a tear in the back portion of the vaginal wall resulting from the insertion of some object into the vagina, which would explain the initial difficulty in inserting the catheter. The injuries to the anus and vagina were not consistent with Consuelo being hit by, or running into, a door. The pediatrician believed Consuelo had been sodomized, that something had penetrated the vaginal area and torn the vaginal wall, and that she had been kicked or punched in the abdomen, causing the internal injuries.

Consuelo's condition remained critical and on November 19, 1991, she was transferred to UCLA Medical Center for ongoing critical care. The attending physician noted that she was swollen all over, with significant swelling in the external genitalia that precluded him from fully examining her vagina. She had abnormal sphincter tone. A CAT scan revealed no evidence

---

[2] The charge nurse noted the hematoma was larger than a nickel and smaller than a quarter.

that Consuelo had been struck in the head. In an effort to stop continuing internal bleeding, a second operation, including a splenectomy, was performed on November 20, 1991. Following the operation, the surgeon examined the external genitalia and the anus and saw no evidence of any lacerations at that time. He explained that his inability to see any anal lacerations could have been due to the significant genital swelling.

All efforts to save Consuelo's life failed on November 25, 1991.

The forensic pathologist testified that Consuelo died as a result of acute blunt force penetrating injury of the anus that caused lacerations of the anus and injuries to multiple internal organs. The anus was expanded to seven or eight times its normal size. The injuries to the anus were consistent with penile penetration. There was an acute one-half-inch tear in the vaginal wall at the opening at the back, and the vagina was purple and bruised. Because the tip of a catheter is soft, the forensic pathologist did not think the numerous attempts to insert a catheter caused the vaginal tear, but, rather, thought the existence of the vaginal tear was the cause of the difficulty in inserting a catheter. The skin between the anus and vagina had been rubbed off. The anus, vagina, and bladder showed signs of previous injuries four weeks old.

There were bruises and contusions on both sides of the chest, and five ribs were fractured near the spinal column in a manner consistent with Consuelo being gripped tightly around the chest from behind. There were bruises on Consuelo's back where thumbs would naturally come to rest when she was grabbed around the chest. There was evidence of previous rib fractures three to four weeks old. There was an acute subdural hemorrhage and generalized swelling of the brain, suggesting Consuelo was shaken during the course of the assault.

Consuelo suffered from facial abrasions and contusions, including tearing inside the upper lip consistent with someone holding a hand over her mouth. The injuries to her face were not consistent with a fall or running into something because there were no loose teeth and her nose was not broken. The forensic pathologist believed that after such an assault, Consuelo could not have gotten up and walked around.

Medina testified that in November 1991 she lived in an apartment in Delano with her daughters Christina and Consuelo. Defendant worked as a farm laborer, living both with fellow farm workers at a motel in McFarland and with Medina in her Delano apartment on her days off from work as a nurse's aide at DMC.

On the afternoon of Sunday, November 17, 1991, Consuelo was in good health. Medina testified she changed Consuelo's diaper and then left for work about 6:40 p.m., leaving defendant to care for Christina and Consuelo. Christina and Consuelo were at the table eating hamburgers; defendant was sitting watching television.

Medina testified that at 7:20 p.m. she received a call from Christina, who told her Consuelo was pale, sick, and could not breathe. Medina returned home approximately five minutes later to find defendant sitting on the edge of her bed with Consuelo in his arms. Medina immediately drove Consuelo to DMC, accompanied by defendant and Christina. When the family arrived at the hospital, Medina parked the car in front of the emergency room and took Consuelo inside. Defendant stayed outside in the car alone for approximately 10 minutes.

Child Protective Services removed Christina from Medina's custody following Consuelo's death. As a prerequisite to regaining custody, Medina was required to stop having contact with and visiting defendant in jail, which she had done several times following his arrest. Medina testified that on May 22, 1992, six months after Consuelo's death, Christina told Medina that she remembered a time when defendant, who was caring for them alone overnight, took Consuelo and kept her in his locked bedroom until morning.

Christina testified that after her mother left for work on November 17, 1991, Christina asked defendant for permission to go out and play with her friend Mirabel, who lived in the same apartment complex. Defendant agreed to let her go, and told her to return in 30 minutes. When Christina left, Consuelo was coloring at the kitchen table and defendant was cutting onions to cook with eggs for dinner. Christina went out the front door, which opened inward into the living room of the apartment, and closed the door behind her because it was cold outside. Consuelo, who could not open the door by herself, stayed inside and did not come near the front door as Christina was leaving.

Christina further testified that after she had been playing with Mirabel for about 15 minutes, defendant, acting nervous, came around the corner of the building and called for her to come home. When Christina got back to the apartment, defendant was in Medina's bedroom, holding Consuelo. Consuelo was wearing the same clothes she had been wearing when Christina left, including a diaper. Consuelo had a bruise on her forehead and dried blood under her nose, and defendant was putting alcohol on her forehead. Christina did not wipe the blood from Consuelo, nor did she pick up anything from the bathroom or bedroom floor.

Defendant did not explain what happened but told Christina to call Medina at the hospital. Medina came right home and immediately drove Consuelo, Christina, and defendant back to DMC. Christina testified that while they were in the car, defendant told Medina to "drive slowly." She testified that defendant said Christina hit Consuelo with the front door when Christina walked outside, and that he found Consuelo outside, picked her up, sat her on Medina's bed, and then went to get Christina. Christina testified she did not hit Consuelo with the door.

A Delano Police Department detective interviewed defendant twice on November 18, 1991. Defendant was informed of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], prior to the second interview, which took place after he was arrested. Defendant told the detective he started preparing dinner for himself, Christina and Consuelo when Medina left for work; that Christina asked for his permission to play with her friend and said she would only be gone for about 15 minutes; Consuelo apparently followed Christina outside, and Christina brought her back inside. Defendant told the detective that when Christina started to go out again, he told her she was to take Consuelo along, but Christina did not want to and tried to hurry out the door. When Consuelo again attempted to follow, Christina shut the door hard and quickly.

Defendant told the detective that either just before or just after the door was shut, defendant returned to the kitchen. About a minute later, he noticed he was hearing no sound from Consuelo. He could not see the front door from the kitchen, and went into the living room where he found the front door partially ajar. He opened the front door and saw Consuelo right outside the door on a grassy area adjacent to the carport. She was lying on her back looking up, her head slightly tilted to one side, with blood on her nose and mouth. She was vomiting. Defendant picked her up and took her to Medina's bedroom, put her on the bed, and then cleaned up her face using some toilet tissues. At that point, defendant said that "[Consuelo] looked bad, that her eyes were contorting and rolling and he could tell she was injured bad." Defendant told the detective he went outside and walked to the end of the apartment building where he met up with Christina, who was then returning home. Defendant remembered cleaning up the vomit. He confirmed that Consuelo had only been out of his sight for one minute.

On November 20, 1991, the criminalist for Kern County Regional Crime Laboratory searched the apartment. She looked for but could not find any blood or vomit or any indication that either had been cleaned up in the area outside or just inside the front door. In a wastebasket near the entrance to the dining room, she found paper towels soaked with vomit that contained

semi-digested food particles consistent with a hamburger bun and carpet fibers consistent with the rug in the apartment. She found no dirt or gravel or any other substance she would have expected to find had the vomit been cleaned up from outside. Uncooked eggs were found in a bowl on the kitchen counter; crayons and a coloring book were found on the dining room table.

The criminalist found a towel containing blood and semen on the master bedroom floor.[3] Definitive identification of the donors of the blood and semen was not possible, but the blood was consistent with that of both Medina and Consuelo, and the semen was consistent with that of defendant. She found a few drops of blood, which might have been older and which could not be tested, splattered on the wall of the master bedroom, bloody tissues in the bathroom wastebasket, and vomit, in a pattern indicating it came from a downward motion, on the right leg of the pants defendant was wearing when he was arrested. Neither defendant's pants nor his underclothes revealed evidence of blood or semen. The clothing that had been removed from Consuelo at DMC and placed in a hospital bag revealed no tearing or dirt or other markings that would indicate that Consuelo had hit the pavement, and no semen was detected. There was no diaper included in the bag of clothing. The only diaper ever found in the apartment was a soiled diaper found in the kitchen trash; it contained no blood.

A California Highway Patrol accident investigator testified Consuelo would not have landed outside the apartment door on the grassy area between the building and the carport had she been hit by a car traveling in the driveway, or by a car backing into a parking space in the carport. Had a car traveling on the driveway hit Consuelo, he would have expected to see signs of trauma on her clothing as well as contusions and abrasions at the point of impact. A microscopic examination of her clothing revealed no signs of trauma. Had a car backing into a parking space in the carport hit her, he would have expected to see far less severe injuries to Consuelo and possibly damage to the carport pole. He found no damage to the carport pole. He had never seen vaginal or anal injuries result from a car accident.

### 2. The Defense Case

The defense presented testimony of two medical experts who explained that Consuelo's injuries were consistent with a fall or a car accident or the

---

[3] Medina testified that she and defendant had had sexual intercourse the night before Consuelo was injured, that Medina had her menstrual period, and that she and defendant had used a brown towel to clean themselves afterward. She threw the towel on the floor, and the next morning gathered up laundry, including towels from the bedroom floor, to take to the laundromat, but was unable to do a wash because the laundromat was too full. She did not explain how the brown towel came to be found again on the bedroom floor.

effects of various medical procedures employed during the eight days Consuelo was in the hospital, and were inconsistent with anal and vaginal penetration. The defense also established that the criminalist discovered an unidentified pubic hair on the outside of Consuelo's jacket, and the UCLA Pathology Department removed some plant material from Consuelo's nasal pharynx.

Defendant testified that before Medina left the house, she changed Consuelo's diaper. When she left, Christina and Consuelo were watching television in the living room and defendant got up and went to the kitchen to cook eggs for himself for dinner. He gave Christina permission to play with Mirabel but told her not to be too long.

Defendant offered conflicting testimony regarding whether or not Consuelo went outside when Christina left. In one version he stated Christina and Consuelo both went outside and he did not know if Consuelo came back inside. In a second version he stated Christina picked up or grabbed Consuelo and they went outside together. He saw them both come back inside and Christina then left again, and defendant was not aware that Consuelo had gone outside again until he did not hear her while he was in the kitchen cooking the eggs.

When he did not hear Consuelo, he went to the front door and saw that the door was open. He looked outside and saw her lying on the ground. He picked her up and saw that she was "real sick." She was lying on her back, her eyes were turned up, she was bleeding from her nose and mouth, and she was vomiting. He laid her on the sofa and went to call Christina. He then took Consuelo into his bedroom and turned on the fan so she could get some air because she was having trouble breathing. He tried to clean her face using some toilet paper. When Christina came in, he was in the bedroom with Consuelo on his lap, and he told Christina to call her mother. After he took Consuelo inside, and before going to call Christina, he cleaned up the vomit that was outside, using kitchen towels he threw in the trash can.

Defendant testified Christina used a towel to clean the blood off Consuelo. He told her not to use the towel that was on the bedroom floor because it was dirty. He never told anyone he thought Consuelo ran into the door, and he did not tell Christina he thought she had closed the door on Consuelo. The front door to Medina's apartment opened inward; a person leaving the house would pull the door closed behind her. Defendant agreed that if Consuelo had hit her head on the door while trying to follow Christina outside, she would have been inside, not outside, the apartment.

Defendant denied knowing what happened to Consuelo, and denied taking off her diaper, sodomizing her, throwing her against the wall, kicking her, or otherwise harming her.

### B. *Penalty Phase Evidence*

The prosecution presented three witnesses at the penalty phase. Consuelo's aunt and two cousins testified regarding how Consuelo's death had affected her family. Defendant presented two witnesses. A lifelong friend testified that defendant was a noble, calm person, and a prior employer testified that defendant was a good worker and a good, nonviolent person. The parties stipulated that defendant had no prior felony convictions or prior acts of violent conduct.

## II. PRETRIAL ISSUES

### A. *Absence of Lead Counsel During Portion of Jury Selection*

For less than an hour on March 25 and March 26, 1993, Jeffrey Harbin, who had been appointed pursuant to section 987, subdivision (d) in January 1992, as defendant's cocounsel, conducted the voir dire of prospective jurors while lead counsel Donnalee Huffman was not present in the courtroom. Defendant contends that Huffman's absence was a presumptively prejudicial violation of his right to counsel at a critical stage of the proceedings. (*United States v. Cronic* (1984) 466 U.S. 648, 659 [80 L.Ed.2d 657, 104 S.Ct. 2039] (*Cronic*).)

■ A criminal defendant enjoys the right to counsel under both the state and federal Constitutions (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Gideon v. Wainwright* (1963) 372 U.S. 335, 339–345 [9 L.Ed.2d 799, 83 S.Ct. 792]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1069 [119 Cal.Rptr.2d 859, 46 P.3d 335]). A complete denial of counsel at a critical stage of the proceedings, including during jury voir dire (*Gomez v. United States* (1989) 490 U.S. 858, 873 [104 L.Ed.2d 923, 109 S.Ct. 2237]), gives rise to a presumption that the trial was unfair (*Cronic, supra*, 466 U.S. at p. 659). But when the defendant is represented by counsel, the presumption of prejudice will only stand when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing. (*Bell v. Cone* (2002) 535 U.S. 685, 695 [152 L.Ed.2d 914, 122 S.Ct. 1843]; *Cronic*, at p. 659.) ■ A trial court has discretion to appoint second counsel for a capital defendant (§ 987, subd. (d); *Keenan v. Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108]), but a capital defendant is not entitled to the courtroom presence of both appointed counsel at all times (*People v. Carpenter* (1997) 15 Cal.4th 312, 376 [63 Cal.Rptr.2d 1, 935 P.2d 708] (*Carpenter*); *People v. Montiel* (1993) 5 Cal.4th 877, 906, fn. 5 [21 Cal.Rptr.2d 705, 855 P.2d 1277]).

Here, either lead counsel or cocounsel, or both, were present at all times, and defendant does not contend that cocounsel entirely failed to subject the prosecution's case to meaningful adversarial testing. We will not presume, and defendant does not show, prejudice resulted from lead counsel's absence for less than an hour during jury selection.

B. *Excusal of Prospective Jurors Based Upon Questionnaire*

Defendant contends the trial court erred in excusing, upon stipulation, eight prospective jurors based solely upon their responses to juror questionnaires without follow-up questioning.

The court, which has the discretion to allow parties to ask or submit supplemental questions, must conduct the initial examination of jurors. (Code Civ. Proc., § 223.) Upon completion of the court's initial examination, the parties have the right to examine the prospective jurors. (*Ibid.*) In capital cases, death-qualifying examination pursuant to *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], is conducted individually, and in sequestration at the discretion of the court. (*Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168, 1172, 1177–1182 [71 Cal.Rptr.2d 91].)

The court initially submitted two questionnaires to each prospective juror, one regarding hardship and the other specific to death qualification. The court and counsel conducted the hardship voir dire. Thereafter, taking groups of 24 prospective jurors at a time, the court and counsel conducted additional general voir dire in the presence of all prospective jurors, and then began with the individualized and sequestered *Hovey* voir dire. Later, after having conducted several days of general and *Hovey* voir dire, the court stated, "Counsel have indicated also, yesterday, that, having reviewed the questionnaires from today, and having the benefit of extensive voir dire of a number of other individuals in this particular case, that, in the interest of time, and more particularly in the interests of justice, they are prepared to agree that certain of our prospective jurors for this morning may be excused." Over the course of the day, counsel stipulated that eight prospective jurors could be excused based upon their responses to questionnaires alone. As a result, these eight prospective jurors were excused without having been subject to the general voir dire by court and counsel, or the individual *Hovey* voir dire.

Defendant contends this procedure violated his rights to an impartial jury because it materially departed from the statutory scheme in that it eliminated the court from the voir dire process and resulted in the excusal of at least seven death-qualified prospective jurors.

■ Defendant is barred from raising on appeal this claim regarding defects in the jury selection procedure. (See, e.g., *People v. Cudjo* (1993) 6 Cal.4th 585, 627–628 [25 Cal.Rptr.2d 390, 863 P.2d 635].) "As we stated in [*People v.*] *Visciotti* [(1992) 2 Cal.4th 1, 37–38 [5 Cal.Rptr.2d 495, 825 P.2d 388]], 'counsel acquiesced in the [voir dire] procedure of which defendant now complains. . . . [¶] . . . [¶] . . . While the parties are not free to waive, and the court is not free to [forgo], compliance with the statutory procedures which are designed to further the policy of random selection, equally important policies mandate that criminal convictions not be overturned on the basis of irregularities in jury selection to which the defendant did not object or in which he has acquiesced. [Citations.]' ([Citation]; see also Cal. Const., art. VI, § 13 [no reversal for procedural errors absent a 'miscarriage of justice'].)" (*People v. Ervin* (2000) 22 Cal.4th 48, 73 [91 Cal.Rptr.2d 623, 990 P.2d 506] (*Ervin*).)

In *Ervin*, the parties stipulated to the excusal of numerous prospective jurors based upon their answers to questionnaires. Because the defendant acquiesced in the procedure, and the procedure benefited all parties by screening out "overzealous 'pro-death' as well as 'pro-life' venirepersons," thereby culling out prospective jurors who probably would have been unable to serve as jurors, we found no error. (*Ervin, supra,* 22 Cal.4th at p. 73.) Defendant asserts, without authority, that *Ervin* was wrongly decided, and argues *Ervin* is distinguishable because the trial court here requested counsel show a legitimate reason for agreeing to the stipulated excusals. By doing so, argues defendant, the trial court rendered the excusal procedure to be one based upon judicial discretion rather than stipulation of parties. We disagree. The record reveals no indication that in making the request the trial court was passing on the adequacy of the reasons for the stipulations.

■ Were we to address this claim on the merits, it would fail. An appellate court applies the abuse of discretion standard of review to a trial court's conduct of the voir dire of prospective jurors. (See Code Civ. Proc., § 223.) ■ A trial court abuses its discretion when its ruling " 'fall[s] "outside the bounds of reason." ' " (*People v. Waidla* (2002) 22 Cal.4th 690, 714 [94 Cal.Rptr.2d 396, 996 P.2d 46], quoting *People v. DeSantis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) The trial court did not act unreasonably in allowing counsel to *prescreen* prospective jurors whose questionnaires showed they were probably subject to challenge and excusal. (See *Ervin, supra,* 22 Cal.4th at pp. 72–74.) Both defense counsel and the prosecutor recognized upon review of the questionnaires alone that they did not want to accept any of these prospective jurors, and neither felt it necessary to inquire further into the prospective jurors' views on the death penalty. Instead of pursuing additional questioning, they mutually agreed to

reject these prospective jurors. Defendant fails to show how this procedure was unreasonable.

Finally, defendant argues that because he was absent when the prosecutor and defense counsel agreed to stipulate to the excusal of these eight prospective jurors, he was denied the right to be present at a critical stage of the trial in violation of the Fourteenth Amendment guarantee of due process. (*United States v. Gagnon* (1985) 470 U.S. 522 [84 L.Ed.2d 486, 105 S.Ct. 1482].)

█ This claim is without merit. A defendant is not entitled to be personally present during proceedings that bear no reasonable, substantial relation to his opportunity to defend the charges against him, and the burden is on the defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial. (See *People v. Hovey* (1988) 44 Cal.3d 543, 585–586 [244 Cal.Rptr. 121, 749 P.2d 776] (*Hovey*).) Defendant was present at all stages of jury selection, including when counsel entered into the stipulation and when the prospective jurors were excused. When trial was not in session, the court overheard the meeting in the courtroom between all counsel during which counsel discussed and agreed to exclude a number of prospective jurors, but whether defendant was present at counsel table during these prestipulation discussions is not a matter of record. Even assuming he was absent, however, he only speculates "his consultation with [counsel] could reasonably have resulted in these prospective jurors not being excused." He fails to show that his presence would have served a purpose.

For the foregoing reasons, we also reject defendant's claims this jury selection procedure violated his right to due process, an impartial jury, and a reliable penalty verdict in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 13 and 15 of the state Constitution.

### III. GUILT PHASE ISSUES

#### A. *Evidence That Medina Associated with Convicted Child Molester*

The prosecution sought to introduce evidence showing that sometime after Consuelo's death, Medina began an association with Joe Avila, who she knew had been convicted of molesting some of the children in his own family. She saw Avila at Consuelo's funeral in 1991, and on various holidays in 1992. He gave her gifts and helped her move; she lent him tools. Avila lived in a house with his sister and her children, and Medina allowed Christina to spend the night at that house on one occasion. Medina did not tell Christina that she should be wary of Avila. In July 1992, when Medina was asked if she knew Avila was a child molester, she replied that she did not know and did not care.

Defendant argued this evidence was irrelevant and was being offered to prove that because Medina consorted with a known child molester, defendant was a child molester as well. By way of explanation, the prosecutor stated, "I believe it is relevant to show that she would allow a man who was abusing her child to be around her child even though she had that knowledge. And I think it is very relevant at this point to show how this man had access to this child and how he was able to do the things he had done without her reporting anything to anyone and without her divulging that material." The court confessed a curiosity as to why Consuelo's prior injuries had not been reported, and concluded that the evidence regarding Avila "might be relevant to show that this is the type of mother who would not report that because she cares more about her adult companion than she does her minor children. . . . And this is probably the only evidence that is going to be available to explain some of the apparent inconsistencies or deficiencies with regard to the actions and/or inactions of the mother." The court admitted the evidence, and instructed the jury that the evidence was admitted "for a limited purpose . . . [and] that limited purpose is not to show that the accused may have shared any of the traits that apparently are going to be attributable to this other individual, but instead this evidence is only to be considered by you, if at all, with regard to what [Medina] has said and/or has done."

Defendant again now claims this evidence was irrelevant. We conclude the evidence was of limited probative value and the court did abuse its discretion in admitting the evidence in question, but that the error was harmless.

■ Only relevant evidence is admissible (Evid. Code, §§ 210, 350), and all relevant evidence is admissible unless excluded under the federal or state Constitution or by statute. (Evid. Code, § 351; see also Cal. Const., art, I, § 28, subd. (d); *People v. Heard* (2003) 31 Cal.4th 946, 972–973 [4 Cal.Rptr.3d 131, 75 P.3d 53] (*Heard*).) The test of relevance is whether the evidence "tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." (*People v. Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664].) ■ The trial court has broad discretion in determining the relevance of evidence, but lacks discretion to admit irrelevant evidence. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 132 [36 Cal.Rptr.2d 474, 885 P.2d 887].) We review for abuse of discretion a trial court's rulings on the admissibility of evidence. (*Heard*, at pp. 972, 974; *People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

Consuelo sustained serious injuries on November 17, 1991, while left by Medina under defendant's care. Nothing in the record established that before then, Medina either associated with Avila or had knowledge or reason to

suspect defendant was abusing Consuelo.[4] The fact, therefore, that she kept company with known child-molester Avila after Consuelo's death was of limited probative value to the determination of defendant's guilt.

That being said, any error in admitting this evidence was harmless. In light of the strong evidence against defendant, including facts showing that Consuelo's fatal injuries were sustained during the 15 minutes defendant was alone with her, that defendant admitted she was out of his sight for only one minute, and that her injuries were strongly consistent with physical and sexual abuse, it is not reasonably probable the jury would have reached a different result regarding defendant's guilt had the court excluded the evidence that Medina was not fastidious in her choice of adult companions. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see *People v. Marks* (2003) 31 Cal.4th 197, 226 [2 Cal.Rptr.3d 252, 72 P.3d 1222] (*Marks*).)

█ For the first time on appeal, defendant also claims that the trial court's ruling violated his rights to due process and a reliable penalty determination pursuant to the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution. The People contend defendant waived his constitutional claims by failing to raise them below and only objecting that the evidence was not relevant and was more prejudicial than probative. (Evid. Code, § 352.) Assuming the claim was properly preserved for appeal (see *People v. Yeoman* (2003) 31 Cal.4th 93, 117, 133 [2 Cal.Rptr.3d 186, 72 P.3d 1166] (*Yeoman*)), defendant's constitutional claims fail on the merits because, generally, violations of state evidentiary rules do not rise to the level of federal constitutional error. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 70 [116 L.Ed.2d 385, 112 S.Ct. 475].)[5]

### B. *Evidence of Uncharged Crimes*

Before trial, defendant moved in limine to exclude from the guilt phase any evidence of uncharged crimes, specifically Christina's statements that, when she and Consuelo were left alone with defendant overnight sometime before September 24, 1991, she saw defendant take Consuelo from her own bedroom into his bedroom, that he locked the door and kept her there all night, and that Consuelo emerged her usual self the following morning. Christina told officers she "believed [defendant] raped [Consuelo]." Defendant also sought exclusion of statements of Diana Alejandro, Consuelo's aunt,

---

[4] Christina did not tell Medina about the incident when defendant took Consuelo into his bedroom overnight until six months after Consuelo's death.

[5] Further, because we conclude this evidence was irrelevant, we need not address defendant's new contention that it was inadmissible character evidence pursuant to Evidence Code section 1101, subdivision (a).

that around Halloween, 1991, Consuelo had not been feeling well, was throwing up, was not herself, was not smiling, and had changed. Diana told officers she had a "gut feeling" that defendant was molesting and sodomizing Consuelo.

In his moving papers defendant sought exclusion of these statements on the ground that Evidence Code section 1101, subdivision (a) precluded the admission of such evidence because it tended to show his disposition to commit criminal acts. He also argued the evidence was unduly prejudicial and violated the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the state Constitution.

At the hearing on the motion, defense counsel clarified they sought exclusion solely of two "statements of opinion"—the portion of Christina's statement that she believed defendant raped Consuelo, and the portion of Diana's statement that she had a "gut feeling" defendant was molesting and sodomizing Consuelo. The trial court granted the motion to exclude these statements of opinion, and defense counsel stated she had no objection to the introduction of the remaining "percipient" portions of the statements—that in September Christina saw defendant take Consuelo into his bedroom overnight and lock the door, and that Diana observed Consuelo's illness at or around Halloween.

■ Defendant now claims the trial court erred by not excluding the percipient portions of the statements, contending these statements constituted evidence of uncharged prior criminal acts of physical and sexual abuse, inadmissible under Evidence Code section 1101, subdivision (a). Because defendant failed to object to the introduction of this evidence at trial, however, he failed to preserve this claim for appeal. (Evid. Code, § 353; see, e.g., *People v. Champion* (1995) 9 Cal.4th 879, 918–919 [39 Cal.Rptr.2d 547, 891 P.2d 93] (*Champion*) [reviewing courts will not consider a challenge to the admissibility of evidence absent a specific and timely objection in the trial court on the ground sought to be urged on appeal].)

■ Anticipating our conclusion, defendant contends that defense counsel rendered ineffective assistance in violation of the Sixth Amendment to the federal Constitution (see *Strickland v. Washington* (1984) 466 U.S. 668, 687–692 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*)) and section 15 of article I of the state Constitution (see *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218 [233 Cal.Rptr. 404, 729 P.2d 839]) by failing to object to the introduction of the percipient portions of the statements or to seek a jury instruction limiting the use of this evidence. To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the

defense. (*Strickland*, at pp. 687–688, 693; *Ledesma*, at p. 216.) Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland*, at pp. 687–688.) Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*Id.* at pp. 693–694.)

■ We find no deficient performance. Defendant claimed Consuelo's fatal injuries were caused by an accident or by medical personnel. The prosecution had the burden of proving every element of the crime charged, including that the death was the result of an intentional act by *someone*, and not an accident. (See *Estelle v. McGuire, supra*, 502 U.S. at p. 69.) Medical evidence established Consuelo had suffered prior internal injuries similar to the fatal injuries suffered on November 17, 1991. Forensic evidence established the prior injuries were inflicted one to two months prior to November 17. The percipient evidence established that in late September 1991, defendant exhibited abnormal, secretive behavior with Consuelo and had the opportunity to inflict these injuries. Within the same time frame, Consuelo exhibited physical and emotional symptoms consistent with the intentionally inflicted injuries the later medical examinations disclosed. Thus, the percipient evidence was in harmony with the forensic evidence. From this evidence, the jury could reasonably infer that defendant's intentional acts caused Consuelo's prior injuries. This inference, in turn, was probative in establishing that the fatal injuries resulted from sexual abuse rather than an accident. Admission of the percipient evidence, therefore, was proper under Evidence Code section 1101, subdivision (b),[6] and counsel was not deficient in failing to seek its exclusion.

Defendant further claims the introduction of this percipient evidence violated his right to due process under the Fourteenth Amendment to the federal Constitution. This claim fails because, as we have concluded, the evidence was properly admitted. He also argues the trial court failed to weigh the prejudicial effect of this evidence against its probative value. This claim has no merit: Counsel agreed to the admission of this evidence and the court was not required to make such a determination sua sponte. (See *People v. Visciotti, supra*, 2 Cal.4th at p. 53, fn. 19.)

Finally, defendant contends the trial court erred by failing to instruct the jury sua sponte with CALJIC No. 2.50 regarding the limited purpose for

---

[6] Evidence Code section 1101, subdivision (b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

which the evidence of other crimes was admitted.[7] At a conference on jury instructions, defense counsel asked the trial court *not* to instruct on evidence of uncharged crimes, asserting there was no evidence defendant had committed any prior crimes. The trial court had no duty to give such an instruction in the absence of a request. (*People v. Padilla* (1995) 11 Cal.4th 891, 950 [47 Cal.Rptr.2d 426, 906 P.2d 388], overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 822–823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].) A fortiori, it had no duty to do so over counsel's objection. We conclude there was no ineffective assistance in the position taken by counsel with regard to this instruction. Counsel could reasonably have concluded such an instruction would have emphasized in the jurors' minds a characterization of defendant she was trying to avoid—that defendant's actions toward Consuelo were, indeed, criminal.

### C. *Questioning of Defendant Regarding Surprise at Being Charged with Sodomy and Rape*

During defendant's direct examination, defense counsel asked, "Mr. Benavides, were you surprised when the Police Department charged you with the crime of sodomy and rape of this child?" Before he replied, the court sustained the prosecutor's objection on the grounds of relevancy.

Defendant now argues that his objective in seeking to introduce this testimony was to refute the implication that he harbored consciousness of guilt, as suggested by prosecution evidence regarding his demeanor at the hospital where he exhibited "little concern," his having stayed in the car while Consuelo was initially brought into the emergency room, his "nonchalant" attitude witnessed by nurses at DMC, his silence, his staring at the floor, and his failure to make eye contact with the detectives during initial interrogations. He argues that the exclusion of his answer amounted to the exclusion of exculpatory evidence showing that he had no such guilty knowledge.

 This claim was not properly preserved for appeal. As we have emphasized in the past, " 'our review on direct appeal is limited to the appellate record.' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 952 [95

---

[7] CALJIC No. 2.50, as applicable here, instructs as follows: "[Evidence has been introduced for the purpose of showing that the defendant committed [a crime] [crimes] other than that for which [he] [she] is on trial[.] . . . [¶] . . . [This] . . . evidence, if believed, [may not be considered by you to prove that defendant is a person of bad character or that [he] [she] has a disposition to commit crimes. It] may be considered by you [only] for the limited purpose of determining if it tends to show: [¶] . . . [¶] [The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged;] [¶] . . . [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case."

Cal.Rptr.2d 377, 997 P.2d 1044].) Defendant did not answer the question posed to him or make an offer of proof (Evid. Code, § 353; *People v. Valdez* (2004) 32 Cal.4th 73, 108 [8 Cal.Rptr.3d 271, 82 P.3d 296] (*Valdez*) [to preserve an alleged error for appeal an offer of proof must inform the trial court of the purpose and relevance of the excluded evidence]), and we decline to speculate as to what defendant now claims—that he was surprised at his arrest because he did not think himself guilty of the charges.

Further, defendant fails to show the court abused its discretion in excluding the answer to his question. In light of defendant's consistent testimony that he did not know what happened to Consuelo and was not guilty of the charged offenses, any self-serving assertion that he was surprised at his arrest for rape and sodomy was of limited probative value and would have added little, if anything, to defendant's posture at trial.

Defendant also claims that court error in excluding this evidence violated his rights to due process, to present a defense, to testify on his own behalf, and to a reliable penalty determination pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. This federal claim fails because, as we have concluded, the trial court's exclusion of this evidence was not in error.

### D. *Admission of Photographs of Victim While Still Alive*

Over defendant's objections, the court admitted into evidence three photographs of Consuelo taken at the UCLA Medical Center on November 21, 1991, four days after she sustained her fatal injuries and four days before she died.

People's exhibit No. 35 depicted Consuelo lying naked and swollen on a hospital bed, her genitals exposed, covered with medical tubing and bandages. Defendant objected to its admission, arguing that the angle from which that picture was taken emphasized the genital area and was inflammatory and prejudicial. The court agreed that when first viewed, the photograph "invokes a certain amount of sympathy," but found that it fairly and objectively assisted in explaining much of the testimony.

Defendant's exhibit Z is a close-up view of Consuelo's anus and vagina, showing profound redness, rawness, and swelling. Defendant's exhibit AA is a close-up view of her vagina with a catheter inserted. The prosecution offered the photographs into evidence, noting a medical expert was asked about them. The defendant objected to their introduction on the ground they were inflammatory. The court received defendant's exhibits Z and AA into evidence, stating, "[I]n terms of them being inflammatory, I might have agreed at the outset of the case, but I certainly don't think so now."

Defendant argues the admission of these photographs violated Evidence Code section 352 in that they had no probative value and were extremely prejudicial, inflammatory, and cumulative.

 When a defendant makes a claim that photographs of the victim are unduly gruesome or inflammatory, their admission lies within the broad discretion of the trial court. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1136 [113 Cal.Rptr.2d 27, 33 P.3d 450] (*Kipp*).) " 'The [trial] court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect.' " (*Heard, supra,* 31 Cal.4th at p. 976.) Evidence is prejudicial when it " ' "uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. [Citations.]" ' " (*People v. Hart* (1999) 20 Cal.4th 546, 616 [85 Cal.Rptr.2d 132, 976 P.2d 683].) " '[T]rial courts should be alert to how photographs may play on a jury's emotions, especially in a capital case, [and] we rely on our trial courts to exercise their discretion wisely, both to allow the state fairly to present its case as well as to ensure that an accused is provided with a fair trial by an impartial jury.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 424 [127 Cal.Rptr.2d 544, 58 P.3d 391] (*Boyette*).)

The central factual dispute was how Consuelo received the fatal injuries. With the exception of the radiologist, each medical professional who testified regarding her treatment on or after November 17, 1991, was asked to describe what Consuelo's genitals looked like. The jury was entitled to see for itself the condition of Consuelo's body in order to determine whether that evidence did or did not support the prosecution's theory that Consuelo was sexually abused. (*Marks, supra,* 31 Cal.4th at p. 226.) As the trial court stated, these photographs are disturbing, but they are not particularly gruesome, and their probative value far outweighed any prejudicial effect. Having reviewed the photographs, we agree with this assessment.

Further, the photograph in People's exhibit No. 35 was not cumulative, as defendant argues, merely because the facts for which it was offered had been established by the testimony of the pediatrician and the forensic pathologist. (*Heard, supra,* 31 Cal.4th at p. 976.) The photograph helped to clarify the testimony of these medical professionals, much of which, the court admitted, was difficult to follow.

For the first time on appeal, defendant argues the introduction of these photographs violated his rights to due process and a reliable penalty determination guaranteed by the Fifth, Eighth and Fourteenth Amendments to the federal Constitution. Assuming the claim was properly preserved on appeal (*Yeoman, supra,* 31 Cal.4th at pp. 117, 133), defendant's constitutional claims fail on the merits because the photographs were properly admitted.

### E. *Conviction for Lewd and Lascivious Conduct*

Defendant was convicted of rape, in violation of section 261, former subdivision (2) (now subd. (a)(2), as amended by Stats. 1994, 1st Ex. Sess., ch. 40, § 1, p. 8714), sodomy, in violation of section 286, former subdivision (c) (now subd. (c)(1), as amended by Stats. 1998, ch. 936, § 4), and lewd and lascivious conduct, in violation of section 288, subdivision (a). He moved unsuccessfully for an acquittal of the charge of lewd conduct pursuant to section 1118.1, arguing that the only evidence was the same as that which supported the charges of rape and sodomy. Defendant did not receive multiple punishments for the rape, sodomy and lewd conduct convictions; on sentencing defendant to death, the court stayed the execution of sentence on all three sex crimes under section 654.

Defendant now argues that he cannot be convicted of lewd or lascivious conduct under section 288 absent evidence separate from, and independent of, the evidence of rape and sodomy. Upon this premise he also argues that the prosecutor was required to elect the specific act upon which the lewd conduct charge was based; that in failing to make such an election, the prosecution misled the court; and that the jury's finding of guilt of the rape and sodomy charges necessarily precluded a finding of lewd conduct. In essence, he is arguing that the facts of the rape and sodomy alone do not establish lewd conduct.

 Defendant's basic premise is unsound. Unless one offense is necessarily included in the other (*People v. Pearson* (1986) 42 Cal.3d 351, 355 [228 Cal.Rptr. 509, 721 P.2d 595]), multiple convictions can be based upon a single criminal act or an indivisible course of criminal conduct (§ 954). Lewd conduct with a child is not a necessarily included offense of either rape or sodomy, which require only general intent. (*People v. Griffin* (1988) 46 Cal.3d 1011, 1029–1030 [251 Cal.Rptr. 643, 761 P.2d 103].) Lewd conduct with a child is a distinct crime that requires an act upon or with the body of a child under the age of 14, with the specific intent to arouse, appeal to, or gratify the lust or passions or sexual desire of either the perpetrator or the child (§ 288), and can be proven by circumstantial evidence including the nature of the act itself. (*People v. Martinez* (1995) 11 Cal.4th 434, 444–445 [45 Cal.Rptr.2d 905, 903 P.2d 1037].) Rape and sodomy are inherently sexual acts—rape is defined in terms of sexual intercourse (§ 261), and sodomy is defined in terms of sexual penetration (§ 286)—and such definitions support an inference that in raping or sodomizing the victim, the perpetrator intended to sexually gratify himself or the victim. Under such circumstances, a conviction for lewd conduct with a child can be obtained at trial and upheld on appeal by the same evidence used to show the defendant raped and sodomized the child.

Further, contrary to the defendant's assertions, there is evidence in the record in addition to the rape and sodomy that would support a conviction of lewd acts upon a child; in picking up, disrobing, removing the diaper from, and holding and placing Consuelo in a position that facilitated the rape and sodomy, defendant was touching Consuelo with the intent to sexually gratify himself. Even if defendant had stopped short of actually committing the rape and sodomy, the crime of lewd act upon a child would have been complete when defendant touched Consuelo with sexual intent.

■ Defendant argues that the court erred in failing to instruct the jury that it must unanimously decide which specific act supported the lewd conduct charge. Again, this claim lacks merit. We have observed that "[t]he unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100 [270 Cal.Rptr. 817, 793 P.2d 23].) The criminal acts here took place within a very small window of time. The condition of Consuelo's body presented the strongest evidence in support of the crimes of rape and sodomy and of defendant's sexual intent. The jury was not presented with different or conflicting theories as to how the lewd act could have occurred. This was not a case where the jury would agree the defendant sexually assaulted the victim but disagree about which acts he committed. Thus, a unanimity instruction was not required.

Further, because we conclude the lewd conduct charge can be based upon the same conduct as the rape and sodomy charges, defendant's argument that the prosecution failed to elect the specific act upon which the lewd conduct charge was based, and that a finding of guilt of the rape and sodomy charges would necessarily preclude a finding of guilt of the lewd conduct charge, has no merit.

Finally, defendant argues that the lewd and lascivious conduct conviction was obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. Assuming the claim was properly preserved on appeal (*Yeoman, supra,* 31 Cal.4th at pp. 117, 133), defendant's constitutional claims fail on the merits because, as we have concluded, there was no error in the conviction for lewd conduct.

F. *Lewd and Lascivious Conduct Special Circumstance*

Defendant, citing the plurality opinion in *People v. Harris* (1984) 36 Cal.3d 36, 62 [201 Cal.Rptr. 782, 679 P.2d 433] (disapproved on other grounds in *People v. Bell* (1989) 49 Cal.3d 502, 526, fn. 12 [262 Cal.Rptr. 1, 778 P.2d 129]), argues that because the lewd conduct special circumstance is based on the same evidence as the rape and sodomy special circumstances,

the lewd conduct special circumstance violates the federal and state constitutional prohibitions against cumulative use of the same conduct.

 This essentially reiterates defendant's earlier contention that the rape or sodomy and the lewd conduct are actually the same act described as different crimes, and that it is therefore error to allege three different special circumstances based upon what were actually two criminal acts. Again, defendant's premise is unsound. The distinction between the crimes of rape and sodomy and that of a lewd act on a child, as set forth above, is identical to the distinction between the special circumstance for felony murder in the course of a lewd act on a child and that of felony-murder rape and felony-murder sodomy (see *People v. Stansbury* (1993) 4 Cal.4th 1017, 1069 [17 Cal.Rptr.2d 174, 846 P.2d 756] (*Stansbury*), revd. on other grounds in *Stansbury v. California* (1994) 511 U.S. 318 [128 L.Ed.2d 293, 114 S.Ct. 1526])—even if based upon the same acts, they are different crimes. The special circumstance allegation of felony murder in the course of a lewd act on a child can be based on the same conduct as the allegations of felony-murder-rape and felony-murder-sodomy special circumstances.

 Defendant's attempt to distinguish *People v. Melton* (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741] is unpersuasive. There, we held underlying felonies based on separate felonious acts arising from an indivisible course of conduct with a single criminal intent do not preclude each felony from being considered a distinct aggravating factor under section 190.3, factor (a). Defendant argues his case presented a single act, not an indivisible course of conduct, and separate consideration of special circumstances based upon the rape or sodomy and lewd act would constitute an improper "double-counting" of a single aggravating factor. As discussed above, the rape or sodomy and lewd conduct, while based upon the same conduct, were not the same crimes but were part of an indivisible course of conduct, and therefore each felony can be considered a distinct aggravating factor.

### G. *Jury Instruction on Consciousness of Guilt*

Over defendant's objection that there was insufficient evidence in support, the court instructed the jury pursuant to CALJIC No. 2.03 regarding consciousness of guilt.[8] Defendant again raises this claim, and further argues the instruction was argumentative and lessened the prosecution's burden of proof.

---

[8] The court instructed, "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime or crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

The People are incorrect in their assertion that defendant forfeited his latter claim on appeal by failing to make a timely objection. (*People v. Hannon* (1977) 19 Cal.3d 588, 600 [138 Cal.Rptr. 885, 564 P.2d 1203] [lack of objection did not waive right to appellate review of instruction on consciousness of guilt]; § 1259.) Defendant's claim of error, however, has no merit. Contrary to his assertions, there was sufficient factual support for this instruction. Defendant's statements to the detective ("I didn't know what had happened to her, if she fell from a ladder or she got hit by a car"), and to his family ("they had found the little girl on the street thrown, and . . . [I] thought that there had been an accident on the street"), could properly have been understood by the jury as attempts by defendant to deflect attention away from his own criminal responsibility by deliberately offering misleading speculation as to what might have caused Consuelo's injuries. That his efforts to do so were unsuccessful does not render these statements any less powerful indicators of his consciousness of guilt; "[a] prior statement, although exculpating in form, may prove highly incriminating at the trial because, upon a showing of its falsity, it can constitute evidence of consciousness of guilt." (*People v. Underwood* (1964) 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937].)

In addition, we have previously determined that CALJIC No. 2.03 does not lessen the prosecution's burden of proof. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) The instruction does not improperly permit the jury to draw irrational inferences, nor is it impermissibly argumentative. (*People v. Nakahara* (2003) 30 Cal.4th 705, 713 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) We decline defendant's invitation to reconsider these determinations.

Defendant also argues on appeal that the instruction allowed the jury to draw impermissible inferences of guilt in violation of his rights to due process, a fair trial, and a reliable penalty verdict under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. Because the instruction was properly given, these claims have no merit.

## H. *Failure to Give Unanimity Instruction on Theory of Murder*

The court instructed the jury on the alternative first degree murder theories of willful, premeditated, and deliberate murder, as well as felony murder and second degree murder. It further instructed that if the jury agreed defendant was guilty of murder, they must unanimously agree whether the murder was first or second degree. Although requested by the defense to do so, the court did not instruct that the jury must unanimously agree which of the two theories of first degree murder supported the verdict. Defendant claims this omission violated his rights to proof beyond a reasonable doubt, to due

process, and to a reliable determination of allegations that he committed a capital offense pursuant to the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the state Constitution.

 In a criminal case, the jury must agree unanimously that defendant is guilty of a specific crime. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 [108 Cal.Rptr.2d 436, 25 P.3d 641] (*Russo*).) In order to " 'eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed,' " when the evidence suggests more than one distinct crime either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal conduct. (*Ibid.*)

 In *People v. Dillon* (1983) 34 Cal.3d 441, 476, footnote 23 [194 Cal.Rptr. 390, 668 P.2d 697], we said that "in this state the two kinds of murder are not the 'same' crimes and malice is not an element of felony murder." Premised on a mistaken interpretation of this language, defendant argues that felony murder and willful, premeditated, and deliberate murder are two separate and distinct crimes, requiring unanimous agreement as to each. He is incorrect. "Felony murder and premeditated murder are not distinct crimes . . . ." (*People v. Davis* (1995) 10 Cal.4th 463, 514 [41 Cal.Rptr.2d 826, 896 P.2d 119].) As we have repeatedly explained, the statement referred to in *Dillon* "means only that the two forms of murder have different elements even though there is but a single statutory offense of murder." (*Kipp, supra*, 26 Cal.4th at p. 1131; see *Carpenter, supra*, 15 Cal.4th at pp. 394–395.) When, as here, the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed, the jury need not unanimously agree on the theory under which the defendant is guilty. (See *Russo, supra*, 25 Cal.4th at p. 1132.) This rule of state law passes federal constitutional muster. (*Schad v. Arizona* (1991) 501 U.S. 624, 630–646 [115 L.Ed.2d 555, 111 S.Ct. 2491].) We decline defendant's invitation to reconsider these determinations.

I. *Failure to Instruct on Voluntary and Involuntary Manslaughter*

The trial court instructed the jury on two theories of first degree murder: willful, premeditated, and deliberate murder, and felony murder during the course of rape, sodomy, or lewd acts. The court also instructed on second degree murder. The court refused defendant's request for instructions on voluntary and involuntary manslaughter.

Defendant argues the court erred in refusing to give instructions on manslaughter because there was sufficient evidence to support a verdict of involuntary or voluntary manslaughter, and without such instructions the jury

was left with an "all or nothing" choice between conviction for capital murder and acquittal. We disagree.

■ We have held that a defendant has a constitutional right to have the jury determine every material issue presented by the evidence and that, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present, the failure to instruct on a lesser included offense, even in the absence of a request, constitutes a denial of that right. (*Heard, supra,* 31 Cal.4th at p. 980.) " ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." ' " (*Id.* at p. 981.)

■ "Manslaughter is 'the unlawful killing of a human being without malice.' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87 [96 Cal.Rptr.2d 451, 999 P.2d 675].) A court is not obligated to instruct sua sponte on voluntary manslaughter as a lesser included offense in the absence of substantial evidence that the defendant acted in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or that the defendant killed in " ' "unreasonable self-defense" ' " (*Blakeley,* at p. 88). Pointing to medical evidence that Consuelo's internal injuries were caused by external blows and to the statement of the defense expert who suggested it was not likely Consuelo was injured by running into a door but "the most likely scenario is that this child was abused by someone in a rage," defendant argues a reasonable juror could conclude Consuelo was beaten to death in response to provocation, passion, and spontaneous rage. We disagree. In light of evidence that Consuelo was severely beaten and sexually assaulted, the isolated statement of the expert is not substantial support for a reasonable conclusion that there existed passion and provocation sufficient to reduce culpability from murder to voluntary manslaughter.

■ Further, a court is not obligated to instruct on involuntary manslaughter in the absence of substantial evidence that the defendant killed his victim " 'in the commission of an unlawful act, not amounting to [a] felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' " (*People v. Berryman* (1993) 6 Cal.4th 1048, 1081 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on other grounds in *People v. Hill, supra,* 17 Cal.4th at p. 823, fn. 1.) Consuelo suffered tearing injuries to her anus and vagina and internal injuries equivalent to those suffered in a car accident. For this evidence to support an involuntary manslaughter instruction, there would have to have been sufficient evidence from which the jury could conclude that medical personnel, not defendant, were the sole cause of the injuries to Consuelo's anus and vagina, and that a misdemeanor, not felony, battery was the cause of her internal injuries. A battery is "any willful and unlawful use of force or

violence upon the person of another." (§ 242.) A battery is deemed to be a felony unless specifically designated as a misdemeanor by either the prosecution or the court. (§ 17, subd. (b); *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 902 [135 Cal.Rptr.2d 30, 69 P.3d 951]; *People v. Statum* (2002) 28 Cal.4th 682, 685 [122 Cal.Rptr.2d 572, 50 P.3d 355].) Defendant cites numerous cases of involuntary manslaughter that involved a misdemeanor assault or battery where the act was of a less serious nature than that which would constitute a felony (*People v. McGee* (1947) 31 Cal.2d 229, 238 [187 P.2d 706] [defendant not acting in self-defense fired fatal shot with intent to frighten victim]; *People v. Wild* (1976) 60 Cal.App.3d 829, 832–833 [131 Cal.Rptr. 713] [bar owner's use of deadly force in attempting to stop fleeing misdemeanant]; *People v. Jackson* (1962) 202 Cal.App.2d 179, 183 [20 Cal.Rptr. 592] [defendant knocked victim to ground and jumped on him]; *People v. Mullen* (1908) 7 Cal.App. 547, 549 [94 P. 867] [victim intervened in fight, was hit in head and died a few days later]), and argues that the evidence here could have supported a charge of misdemeanor battery. It could not; in light of Consuelo's vulnerability at the hands of defendant, the secrecy in which the crimes occurred, and the number and severity of injuries inflicted, we cannot find sufficient evidence that Consuelo's assailant engaged in misdemeanor activity, much less that he had committed a lawful act without due caution and circumspection, and that therefore the killing was involuntary manslaughter.

In addition, the jury found true three special circumstance allegations, namely that defendant killed Consuelo during the commission of the felony offenses of rape, sodomy, and lewd conduct on a child under the age of 14. Given these findings, the jury necessarily determined that the killing of Consuelo "was first degree felony murder perpetrated in the commission of rape[, sodomy,] and lewd conduct and not any lesser form of homicide." (*People v. Earp* (1999) 20 Cal.4th 826, 886 [85 Cal.Rptr.2d 857, 978 P.2d 15] (*Earp*).)

Further, contrary to defendant's assertions, the jury was not left with an "all or nothing" choice between capital murder and acquittal when the court refused to instruct on manslaughter. (See *Beck v. Alabama* (1980) 447 U.S. 625, 633–635 [65 L.Ed.2d 392, 100 S.Ct. 2382] [sentence of death violates the Fourteenth Amendment when the jury was not permitted to consider a verdict of guilt of a lesser included noncapital offense and the evidence would have supported such a verdict].) The jury had the choice of finding defendant guilty of second degree murder as instructed by the court.

Finally, defendant argues that the failure to give instructions on voluntary and involuntary manslaughter was prejudicial error resulting in a denial of his rights to due process, a fair trial, and a reliable penalty verdict under the

Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the state Constitution. This claim fails because, as we have concluded, the court did not err.

## IV. PENALTY PHASE ISSUES

### A. *California Death-eligibility Process*

Defendant makes a number of facial challenges to the death penalty scheme in California, arguing in essence that the California death-eligibility process fails to adequately narrow the class of death-eligible defendants. None has merit.

 "The Eighth Amendment to the United States Constitution . . . imposes various restrictions on the use of the death penalty as a punishment for crime. One such restriction is that any legislative scheme defining criminal conduct for which death is the prescribed penalty must include some narrowing principle that channels jury discretion and provides a principled way to distinguish those cases in which the death penalty is imposed from the many cases in which it is not. A death-eligibility criterion that fails to meet this standard is deemed impermissibly vague under the Eighth Amendment." (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 462 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

Defendant argues that under California's statutory scheme, section 190.2 fails to adequately narrow the class of first degree murderers eligible for the death penalty, and that the felony-murder special circumstance, section 190.2, subdivision (a)(17), is overbroad and arbitrary because it can impose capital punishment on one who kills unintentionally. We have held otherwise. (*People v. Anderson* (2001) 25 Cal.4th 543, 601 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

Defendant further claims that the "complete discretion given to the prosecutor by California's death penalty statute to seek, or not to seek, a sentence of death violates the Eighth Amendment ban against cruel and unusual punishment." Again, we have held otherwise. (*People v. Anderson, supra,* 25 Cal.4th at p. 601.)

Finally, defendant contends that because sections 189 and 190.2 overlap, rendering virtually all premeditated murders death eligible, California's death penalty scheme fails to adequately perform the required narrowing function. We have repeatedly held to the contrary. (*People v. Holt* (1997) 15 Cal.4th 619, 697 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

### B. *Victim Impact Evidence*

The prosecution presented three witnesses at the penalty phase: Diana Alejandro, Consuelo's aunt, and Darlene and Virginia Salinas, Consuelo's cousins. All three testified to the effect of Consuelo's death upon family members. Diana told of how one member had a mental breakdown and another suffered from nightmares. Christina, Consuelo's sister, lived with Virginia Salinas in the first months following Consuelo's death; Virginia testified to her observations of Christina, of how Christina would dote upon her four-year-old cousins in a manner similar to the way she used to dote upon Consuelo, and of how Christina said that pictures in magazines of rabbits and bear cubs reminded her of Consuelo.

Darlene Salinas read the following, which she had written: "Chiquita was a playful little girl. Chiquita was her nickname because she was so small and petite. All we could ever see was her two little ponytails bouncing around. She was a very playful and active little girl. She was a joy to be around. I know her cousins and her little nieces will never forget all of the times that she'd been there. Now she is gone, but we will never forget her. We will never get to see her ride a bike or hear her talking or see her graduate from Head Start. And there will never be one day that goes by that we will forget her. We know that she is with God and he will take care of her. Like her sister Christina quoted Matthew 19:14, suffer little children to come to me, and do not forbid them, for such is the kingdom of heaven. Chiquita's family wants justice to be done. We wish and hope to God that nothing like this ever happens again to our children. They are precious and special to us."

Defendant cross-examined none of these witnesses, and in total the prosecution's penalty phase evidence was recorded in seven pages of trial transcript.

Following the prosecution's evidence, defense counsel stated in camera: "There were a couple of objections I would like to make, your Honor. I realize it might be like closing the door after the horse is gone, however, I think to object under these circumstances in the middle of that kind of testimony would have been suicide on behalf of the defense. I would have just about sealed his fate. [¶] The main objection I have is to Darlene Salinas's testimony. It incorporated certain areas that I think were improper for victim impact statement. The statement that she read, we were never given any notice of, we never saw that statement in advance. It referenced things in the future which I think were not proper for victim impact statement. [¶] The other objection I had was to the last witness, which was [Virginia] Salinas. Much of her statements that were made were—contained hearsay, things that were told to her by Christina. I think the hearsay

objection still applies in this case. [¶] I don't think that really objection at that time would have cured it, because, frankly, the bell would have been rung and like I said it would be suicide on behalf of the defense to make the objection at that time. But I wanted to put that on the record." Defense counsel did not make a motion to strike.

The prosecutor countered that he did give notice to the defense that the three witnesses would testify and that Darlene Salinas intended to read something she had written about Consuelo's death. Defense counsel did not deny being given such notice, but stated that he did not recall being told something would be read. The court overruled the objection, finding it untimely and unmeritorious.

Defendant now argues the objection was timely; the prosecution failed to provide proper notice; the evidence presented was not proper victim impact evidence; Darlene's written statement was hearsay and violated the Eighth Amendment to the federal Constitution; and section 190.3, factor (a) is vague and overbroad in violation of the Eighth Amendment.

Although defendant did not object until after the evidence was adduced, he argues that in light of the delicate nature of the evidence being presented, he did, indeed, object at the earliest opportunity. He offers no authority or principle of law supporting this contention. Moreover, he made no motion to strike or exclude the evidence or otherwise correct the perceived error. (See Evid. Code, § 353.) Accordingly, we conclude defendant failed to preserve these claims for appeal. (See, e.g., *Champion*, *supra*, 9 Cal.4th at pp. 918–919.) Anticipating our conclusion, defendant argues defense counsel was ineffective in failing to make a timely objection. No deficient performance is evident in counsel's tactical decision to refrain from interrupting the emotional testimony of Consuelo's family members with an objection. Counsel's concerns about the propriety of that testimony, however, could reasonably have been addressed with a motion to strike, but failure to do so was not prejudicial. The victim impact testimony was short, focused on the expected emotions of the family, not unduly inflammatory, and was therefore admissible (cf. *People v. Pollock* (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353]).

Defendant argues that the prosecutor failed to give him adequate notice of the evidence he intended to produce at the penalty phase. (§ 190.3.) Defendant concedes that the day before the penalty phase began, counsel was given oral notice of the prosecution's intent to call the three witnesses, and further acknowledges that the prosecutor filed a "generic" written notice of aggravation, but argues he was not told that one witness would be reading a prepared statement, or that witnesses were going to be providing evidence of the

impact on persons other than themselves. Defendant, however, was not entitled to a summation of the witnesses' expected testimony. (*People v. Scott* (1997) 15 Cal.4th 1188, 1219 [65 Cal.Rptr.2d 240, 939 P.2d 354].) In light of defendant's failure to seek a continuance and failure to cross-examine any of the penalty phase witnesses, he cannot demonstrate prejudice resulting from any delay in receiving notice. (*People v. Medina* (1995) 11 Cal.4th 694, 771 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

Further, contrary to defendant's assertions, the evidence of how Consuelo's death affected extended family members was not improper victim impact evidence. "Admission of victim impact evidence at the penalty phase of a capital trial is permissible under the Eighth Amendment (*Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597])" (*People v. Brown* (2003) 31 Cal.4th 518, 572–573 [3 Cal.Rptr.3d 145, 73 P.3d 1137]), and such evidence is admissible as circumstantial evidence of the offense under section 190.3, factor (a) (*People v. Brown* (2004) 33 Cal.4th 382, 397–398 [15 Cal.Rptr.3d 624, 93 P.3d 244]). We recently held that evidence showing the direct impact of the defendant's acts on the victim's family and friends is not barred by state or federal law (*People v. Pollock, supra*, 32 Cal.4th at p. 1180). So, too, is the testimony of extended family members.

Defendant's assertion that Darlene's written statement was inadmissible hearsay is incorrect. The statement read by Darlene Salinas was not "a statement that was made other than by a witness while testifying at the hearing" (Evid. Code, § 1200, subd. (a)), but was part of Darlene's in-court testimony. He is also wrong in arguing Darlene's statement that "Chiquita's family wants justice to be done" is "so inflammatory it tended to encourage the jury towards irrationality and an emotional response untethered to the facts of the case, rendering his trial fundamentally unfair under the due process clause of the Fourteenth Amendment to the United States Constitution." (*Boyette, supra*, 29 Cal.4th at p. 444, citing *Payne v. Tennessee, supra*, 501 U.S. at p. 825.) It was a one-line statement without additional explanation or discourse that came at the end of Darlene's short testimony, and could not reasonably be seen as having encouraged an inappropriate response by the jury.

Finally, we reject defendant's argument that section 190.3, factor (a) is unconstitutionally vague and overbroad. (*Boyette, supra*, 29 Cal.4th at p. 445, fn. 12.)

### C. *Prosecution Argument Asking for Equal Mercy*

During closing arguments in the penalty phase, the prosecutor remarked, "I ask you one final thing, that is to give the defendant the mercy that he gave

Consuelo Verdugo. When he asked for your mercy here today through Mr. Harbin, you remember him on the stand denying anything that happened. Mr. Harbin says that he could be rehabilitated, I ask you to remember how he denied every single thing for hours on there. I ask you to show him the same mercy that he showed Consuelo Verdugo and to do justice here today, that is to sentence him to death. Thank you."

Although defendant did not object, he now argues that the prosecutor's statements were an improper appeal to the passions and prejudices of the jury, and thereby constituted misconduct in violation of his rights to due process, a fair trial, and a reliable and individualized penalty determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the state Constitution.

 To constitute a violation of the federal Constitution, prosecutorial misconduct must " 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Valdez, supra,* 32 Cal.4th at p. 122; *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464].) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " (*Valdez,* at p. 122, quoting *Earp, supra,* 20 Cal.4th at p. 858.)

Because defendant did not object, and because an admonition would have cured any harm caused by the prosecutor's statements, he forfeited this claim of misconduct for appellate purposes. (*Valdez, supra,* 32 Cal.4th at p. 122.)

We also conclude this claim fails on the merits.

 In the penalty phase of a capital trial the jury may properly consider any sympathy or pity for the defendant raised by the evidence. (*Lockett v. Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954]; *Woodson v. North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 96 S.Ct. 2978]; *People v. Haskett* (1982) 30 Cal.3d 841, 863 [180 Cal.Rptr. 640, 640 P.2d 776]; *People v. Robertson* (1982) 33 Cal.3d 21, 56–59 [188 Cal.Rptr. 77, 655 P.2d 279].) The trial court "should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed." (*Haskett,* at p. 863.) Considerable leeway is given for appeal to the emotions of the jury as "long as it relates to relevant considerations." (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1110, fn. 35 [259 Cal.Rptr. 630, 774 P.2d 659].)

██ The jury was instructed that they were allowed to consider sympathy, pity, compassion, and mercy for the defendant, as raised by the facts presented.[9] We have held that it is not inappropriate for the prosecution to urge the jury to show the defendant the same degree of mercy he showed his victim. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 464–465 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Edwards* (1991) 54 Cal.3d 787, 840 [1 Cal.Rptr.2d 696, 819 P.2d 436].) In light of the aggravated nature of the offense, a reminder by the prosecution that Consuelo was helpless in the hands of the man to whom she had been entrusted and a suggestion that he deserved an equal measure of mercy did not constitute deceptive or reprehensible methods of persuasion, nor did such comments infect the trial with unfairness. (Cf. *People v. Brown, supra,* 33 Cal.4th at pp. 398–400.)

D. *Limitation of Defense Argument Comparing the Gravity of the Offense to Other Well-known Murder Cases*

During the penalty phase closing argument, defense counsel stated, "There's plenty of examples through history that talk about cases where life was given, life without parole or the death penalty was involved. You may recall Angelo Buono, Hillside Strangler, some years back, early eighties, raped, murdered nine women, strangled them, left their nude bodies thrown by the side of the freeways in Los Angeles."

At that point the prosecution objected to the references to other cases. Defense counsel argued that the references were to matters of common knowledge offered to "give the jury some balancing, to give an idea" of "the worst of the worst," and further indicated he wished to discuss two more recent cases, one that ended in a sentence of life without the possibility of parole, and the other that did not.

The court sustained the objection, stating, "I have no problem with your talking about Charlie Manson . . . Adolf Hitler . . . the Boston Strangler . . . in general terms . . . suggesting that it is the people who commit crimes of such atrocity who are entitled to the death penalty. . . . And suggest then that by comparison an individual who has taken the life of an infant or someone who has gone in and shot two people while in their sleep ought not to receive

---

[9] In full, the instruction read: "An appeal to the sympathy or passions of a jury is inappropriate at the guilt phase of the trial. However, at the penalty phase, you may consider sympathy, pity, compassion, or mercy for the defendant that has been raised by any aspect of the offense or of the defendant's background or character in determining the appropriate punishment. [¶] You are not to be governed by conjecture, public opinion, or public feeling. [¶] You may decide that a sentence of life without the possibility of parole is appropriate for the defendant based upon the sympathy, pity, compassion and mercy you felt as a result of the evidence adduced during the penalty phase."

the death penalty. [¶] But . . . you cannot appropriately single out one, two or three cases, talk about the facts in general and say this person killed nine nurses, fourteen nuns, did whatever, left them and then turned around and got life without parole. . . . . [C]ounsel, if your intent was to say that Buono got life without parole, and if that's what he got then from that jury down there that by contrast Mr. Benavides should get the same thing, I am not going to let you do it."

The court thereafter admonished the jury, stating, "I have sustained the objection that has been raised by the prosecution. In your deliberations you are not to go back and to consider what other jurors may or may not have done in any particular case at any particular time because you were not there. . . . [T]he decision is yours. And in making that decision you ought not to attempt to rely on what some other jurors may have done in any other case, one way or the other."

Defendant argues that the trial court abused its discretion in restricting his closing argument.

 A criminal defendant has a well-established constitutional right to have counsel present closing argument to the trier of fact. (*People v. Marshall* (1996) 13 Cal.4th 799, 854 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) "[The] right is not unbounded, however; the trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark." (*Ibid.*) We have held that when, as here, a factual comparison with other notorious crimes cannot be made without a time-consuming inclusion of all of the facts in mitigation and aggravation, the trial court can exercise its discretion to control the scope of oral argument by refusing to allow defense counsel to compare the subject crime to other murders. (*People v. Hughes* (2002) 27 Cal.4th 287, 398–400 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Roybal* (1998) 19 Cal.4th 481, 528–529 [79 Cal.Rptr.2d 487, 966 P.2d 521].) The court precluded defendant from presenting specific facts about other notorious murder cases where the death penalty was not imposed, but did not preclude him from arguing that there were other murderers worse than he. By imposing such restrictions, the trial court acted within its discretion.

Further, the admonition to the jury was not overly broad. The court did not prohibit the jury from having a point of reference with other cases with which they were familiar while assessing whether or not defendant was the "worst of the worst," but correctly told the jury that each case is to be considered independently, and they were not to speculate as to what was before the jury in another particular case where the defendant did not receive the death penalty when assessing what was before them in this case.

Defendant finally claims the restrictions of the trial court on defendant's closing argument denied his right to counsel and due process under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution, and section 15 of article I of the state Constitution. These claims fail because, as we have concluded, the court did not err.

E. *Jury Instructions on General Principles of Law Relevant to the Evaluation of the Evidence*

As noted, the penalty phase evidence consisted of the testimony of three members of Consuelo's family, who spoke to the grief and sorrow they suffered by her death, and the testimony of two of defendant's longtime friends, who spoke to defendant's good character.

Counsel and the court conferred regarding instructions; defense counsel offered no instructions of his own, and agreed with or did not object to the instructions selected by the court. Nevertheless, to the extent defendant asserts instructional error affected his substantial rights, he is not precluded from raising the claim on appeal even absent an objection in the trial court. (§ 1259; see *People v. Prieto* (2003) 30 Cal.4th 226, 247 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

The court instructed the jury, inter alia, "You must accept and follow the law as I am stating it to you now. And unless I indicate to the contrary, you shall disregard all other instructions that have been given to you in the other phase of this trial." Defendant argues that the jury thus ignored 15 instructions given only at the guilt phase, and the only guidance given in the evaluation of evidence at the penalty phase was a truncated version of CALJIC No. 2.20, which instructed, "Every person who testifies under oath is a witness and you are the sole judges of the credibility of each witness and as to the weight to be given to the testimony of each. In determining the believability of a witness you may consider anything that has a tendency in reason to prove or to disprove the truthfulness or the testimony of the witness including, but not limited to, those factors which were given to you in the earlier instructions." He argues the jury was left with little or no guidance as to how to assess the difficult and emotional penalty phase evidence.

The trial court must instruct, even in the absence of a request, on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. (*People v. Carter* (2003) 30 Cal.4th 1166, 1174–1175 [135 Cal.Rptr.2d 553, 70 P.3d 981].) Contrary to defendant's assertions, the court did not limit the use of the guilt phase instructions, but specifically "indicated to the contrary" that "in determining the believability of a witness, you may consider anything that

has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness, *including, but not limited to, those factors which were given to you in the earlier instructions.*" (Italics added.) At the penalty phase the court need not reread guilt phase instructions when the latter were not limited to use at the guilt phase and when no penalty phase instructions contradict the guilt phase instructions. (*People v. Sanders* (1995) 11 Cal.4th 475, 561 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

▇▇ Defendant further argues that the court erred in failing to instruct the jury sua sponte with CALJIC No. 2.40, which advises that proof of good character may be sufficient, by itself, to raise a reasonable doubt as to guilt. Defendant asserts that this instruction applies to the penalty phase consideration of lingering doubt. By its very language—referring to reasonable doubt as to guilt—this instruction applies only to the guilt phase of trial. (Cf. *People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Even if the court did err in not giving this instruction, however, the jury was not without guidance as to the use of the character evidence presented at the penalty phase. The court instructed pursuant to CALJIC No. 8.85, which states, in pertinent part, "You shall consider, take into account and be guided by . . . any sympathetic or other aspect of defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offenses for which he has been on trial."

Defendant argues that the court erred in not instructing sua sponte pursuant to CALJIC No. 2.27, which admonishes the jury to carefully review the uncorroborated testimony of a single witness offered for proof of a fact. He argues that had this instruction been given, the jury would not have taken the testimony of the grieving family members "at face value" but would have "looked at this evidence [regarding the effect of Consuelo's death upon the surviving family members] with greater skepticism, and given it less weight or even rejected it." We disagree. The court's instruction pursuant to CALJIC No. 2.20, that the jury could consider bias and interest, adequately advised the jury how to assess the credibility of these witnesses.

Defendant finally argues the failure to reinstruct rendered the death verdict inherently unreliable in violation of the Eighth and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution. This claim fails because, as we have concluded, the court did not err.

F. *Jury Instructions on Evidence of Uncharged Acts of Violence as an Aggravating Factor*

▇▇ Section 190.3, factor (b) permits the introduction of all evidence of violent crimes, whether or not they resulted in a conviction, except those of

which the defendant has been acquitted. (*People v. Robertson* (1989) 48 Cal.3d 18, 47 [255 Cal.Rptr. 631, 767 P.2d 1109].) When the prosecution presents substantial evidence of uncharged acts of violence, state law requires an instruction to the effect that the jury may consider such evidence as a factor in aggravation only when the commission of such other crimes is proved beyond a reasonable doubt. (See *People v. Stanworth* (1969) 71 Cal.2d 820, 841–842 [80 Cal.Rptr. 49, 457 P.2d 889]; *People v. Robertson*, *supra*, 33 Cal.3d at pp. 53–56.)

Defendant contends the trial court prejudicially erred by failing to instruct sua sponte that the jury could not consider evidence that he had committed acts of violence against Consuelo—in particular, the "percipient evidence" (see *ante*, at pp. 91–94), when defendant took Consuelo to his bedroom, locked the door, and kept her there all night—unless it first found those other acts proved beyond a reasonable doubt.

■ This claim has no merit. "[I]n the absence of a request, the trial court is under no duty to give an instruction at the penalty phase regarding evidence received at the guilt phase." (*People v. Maury* (2003) 30 Cal.4th 342, 443 [133 Cal.Rptr.2d 561, 68 P.3d 1]; see *People v. Anderson, supra*, 25 Cal.4th at p. 588; *People v. Lang* (1989) 49 Cal.3d 991, 1039 [264 Cal.Rptr. 386, 782 P.2d 627].) "Even when section 190.3, factor (b), criminal activity is expressly alleged, . . . 'the rule absolving the court of a sua sponte duty to instruct on the elements of crimes introduced under [section 190.3, factor (b)] " 'is based in part on a recognition that, as [a] tactical matter, the defendant "may not want the penalty phase instructions . . . [to] lead the jury to place undue emphasis on the crimes rather than on the central question of whether he should live or die." ' " ' " (*People v. Maury, supra*, 30 Cal.4th at p. 443.) Further, when the evidence of uncharged acts of violence is admitted at the guilt phase and is not referred to at the penalty trial, as here, the reasonable doubt instruction is not required. (*People v. Pinholster* (1992) 1 Cal.4th 865, 967 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People v. Rich* (1988) 45 Cal.3d 1036, 1121 [248 Cal.Rptr. 510, 755 P.2d 960].) The percipient evidence, which was but a small part of the guilt phase, played no part in the evidence or arguments in the penalty phase. The prosecution relied upon the facts of the crime itself and the effects of the crime on the victim's family as factors in aggravation under section 190.3, factor (a). Neither the prosecution nor the defense referred to the percipient evidence, and the court did not err by failing to instruct the jury as defendant contends.

Defendant further argues the failure to so instruct the jury violated his right to due process, a fair penalty trial, and a reliable penalty proceeding pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and section 15 of article I of the state Constitution. These claims are rejected because, as we have concluded, there was no error.

### G. *Lewd and Lascivious Conduct Special Circumstance as Factor in Aggravation*

Reformulating one of his guilt phase arguments, defendant contends the jury improperly was permitted to consider duplicative special-circumstance findings since the murder in the course of a lewd act on a child finding was based upon the same set of facts as the felony-murder-rape and felony-murder-sodomy findings, thus resulting in an artificial inflation of the facts in aggravation.

We have previously rejected defendant's premise, and conclude it is equally without merit in the context of the penalty phase. (*Stansbury, supra*, 4 Cal.4th at p. 1069 [rape and lewd act special-circumstance findings required different elements of proof and could be separately considered as aggravating factors].) Again, the rape, sodomy, and lewd conduct were all separate violations, each relevant to the determination of defendant's culpability (see *ante*), and we reject defendant's contention that the inclusion of the lewd act special circumstance constituted double counting of the factors in aggravation.

### H. *Response to Jury Questions*

During penalty phase deliberations, the jury sent a note to the court asking, "Life without the possibility of parole—how permanent is it? Can it be overturned by legal changes? (other than appeal.) Is there a chance for him to walk out of prison? EVER!! EXPLANATION?" Without objection from counsel, the court answered the jury by rereading the instruction that advised, "A sentence of life without the possibility of parole means that Mr. Benavides will remain in state prison for the rest of his life and will not be paroled at any time. A sentence of death means that Mr. Benavides will be executed in state prison." The court then stated, "That instruction answers your question."

Defendant asserts that the court had a duty to admonish the jury it was not to speculate about how future changes in the law might affect defendant's sentence, and to guide the jury into consideration of only relevant evidence, and failed to do so. Defendant made no objection to the court's explanatory response to the jury's question, and, accordingly forfeited his present argument. (*People v. Martinez* (2003) 31 Cal.4th 673, 698 [3 Cal.Rptr.3d 648, 74 P.3d 748].) Had it been properly presented, it would fail on the merits.

Our holding in *People v. Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], precludes either court or counsel from advising the jury regarding the Governor's power to commute both a sentence of death and a sentence of life without the possibility of parole. Such advice violates the

guarantee of a fair decisionmaking process because it invites the jury to speculate about the future actions of unknown persons, directs the jury's attention away from its proper function of weighing aggravating and mitigating factors, and renders arbitrary the decision regarding defendant's punishment. (*Id.* at p. 157.)

When the jury makes a specific inquiry about how a postconviction proceeding such as commutation might affect defendant's sentence, we have suggested that trial courts issue a short statement emphasizing that it would be a violation of the jury's duty to consider the possibility of commutation in determining the appropriate sentence. (*People v. Ramos, supra,* 37 Cal.3d at p. 159, fn. 12.) But such an instruction is not mandatory (see *People v. Bonillas* (1989) 48 Cal.3d 757, 798 [257 Cal.Rptr. 895, 771 P.2d 844]), and we have not required the trial court to address information generally relating to "matters of common knowledge appreciated by every juror who must choose between a death sentence and a sentence of life without parole" such as changes in the law (*Hovey, supra,* 44 Cal.3d at p. 581).

The court's response did not, contrary to defendant's assertions, mislead the jury into improper speculation. By remaining silent on the question regarding the effect changes in the law might have on defendant's sentence and stating, "That instruction answers your question," the trial court essentially focused the jury's attention on the choice they were charged with making—whether defendant was to remain in prison for the rest of his life, or be executed in prison.

Defendant further argues the failure to admonish the jury violated his rights to due process and a reliable penalty determination under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and parallel provisions of the state Constitution. This claim fails because, as we have concluded, the court did not err.

I. *Cumulative Effect of Penalty Phase Errors*

Defendant argues that, even if no single error warrants reversal of the penalty verdict, the cumulative effect of all the errors necessitates reversal. We have found no error, and defendant's argument is consequently without merit.

Finally, defendant urges us to adopt a rule of "plain error review" in capital cases whereby we would reach the merits of otherwise forfeited or waived claims of error. We have previously rejected such suggestions. (See *People v. Wash* (1993) 6 Cal.4th 215, 276–279 [24 Cal.Rptr.2d 421, 861 P.2d 1107] (conc. & dis. opn. of Mosk, J.).)

## V. Disposition

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied April 27, 2005.