Filed 10/20/14  P. v. Peterson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>LISA A. PETERSON,<br><br>      Defendant and Appellant. | A139320<br><br>(Contra Costa County<br>Super. Ct. No. 51301688) |

**INTRODUCTION**

Defendant Lisa Peterson was charged by information with inflicting injury on an elder or dependent adult from December 16 through December 29, 2012 (Pen. Code, § 368, subd. (b)(1); count one), inflicting corporal injury to a spouse on December 29, 2012 (Pen. Code, § 273.5, subd. (a); count two), and assault by force likely to produce great bodily injury on the same date (Pen. Code, § 245, subd. (a)(4); count three).  A jury found defendant guilty as charged in 2013.  The trial court sentenced her to prison for four years and she timely appeals.

Over defense objection, the trial court admitted evidence of prior acts of abuse by defendant against her husband pursuant to Evidence Code section 1109[1] and instructed the jury with CALCRIM Nos. 852 and 853.  On appeal, defendant argues her counsel rendered ineffective assistance of counsel because he failed to object to the wording of those instructions.  We find no error and affirm.

_____

[1]  Unless otherwise indicated, all further statutory references are to the Evidence Code.

1

# STATEMENT OF FACTS

## I. Background

Arthur Peterson was 68 years old at the time of trial. At that time, his only source of income was his Social Security benefits. However, since 1976, he lived in a house he owned at 851 31st Street in Richmond. Mr. Peterson married defendant in 2008. She had no income. However, Mr. Peterson liquidated a couple of annuities to provide them with cash for their living expenses. After they married, Mr. Peterson re-titled the deed to the house to include her and established a trust in both their names that was funded with the house.

From 2008 until December 29, 2012 defendant assaulted Mr. Peterson, though not as severely as she did on December 29. Defendant became angry with Mr. Peterson on a regular basis. She got angry because he took too long to eat when they ate together, he did not have a job, and she thought he was looking at other women (before he went blind). She would sometimes get angry at Mr. Peterson when he said he was hungry and asked for food.

Some days were calmer than others, but she usually punched and kicked Mr. Peterson in his upper body and leg multiple times a day when she became angry. Peterson never reported the abuse because he feared defendant would retaliate against him, both verbally and physically.

When Mr. Peterson first married defendant, he was eating three meals a day. However, in 2009, meals became more irregular. She made the decision when to eat. Oftentimes, Mr. Peterson ate one meal a day; some days, he did not eat at all. That was not of his own volition. Perhaps once a week, defendant would decide he should eat only once in 24 hours. Once or twice a month, defendant would prevent Mr. Peterson from eating for more than 24 hours. One day, when it appeared that defendant was not going to give him anything to eat, Mr. Peterson searched through his garbage can for food. Mr.

2

Peterson weighed between 145 and 150 pounds when he married appellant in 2008. At the time of trial in 2013, he weighed 136 pounds.

Mr. Peterson did not have cauliflower-type ears when he got married in 2008, as his wedding day picture reflected. Starting in 2009, defendant struck Mr. Peterson's ears repeatedly and they became swollen.

In late 2009, defendant kicked Mr. Peterson's lower left leg so frequently the wounds never healed and the leg became infected. Defendant prevented him from taking a shower in the house because she feared she might pick up the infection. He was not sharing a bed with defendant to avoid possibly spreading the infection to her. Instead, Mr. Peterson often slept on the floor, in the same room with defendant or in an adjacent room. Mr. Peterson saw Dr. Ronald Sato at the Doctor's Medical Center about his infected leg. When Dr. Sato questioned him about his malformed ears, Mr. Peterson told him he did not wish to comment on that. He did not reveal anything about the abuse to Dr. Sato because he did not want to "cause trouble" or distract the doctor from taking care of the infection.

In 2010, Mr. Peterson went blind. He tried several times to see a doctor but defendant either cancelled the appointment, made him call to cancel the appointment, or prevented him from keeping the appointment. Mr. Peterson did not see an ophthalmologist until 2013.

Between the middle of 2012 and the end of 2012, defendant physically forced Mr. Peterson to sleep outside at night on the back porch a couple dozen times. She locked the door so he could not get back in. Although the temperature outside was between 50 to 60 degrees, he had no blankets or pillows. At least a half a dozen times he had no clothes. Mr. Peterson fell less than half a dozen times when he was locked outside the house; one of those falls resulted in a fractured leg bone.

Mr. Peterson recalled that once during the summer of 2011, officers came to the house after he had been locked outside. Mr. Peterson "kept pretty quiet" and did not

3

ask the police to remove his wife from the premises because he did not want "trouble" from defendant.

In 2011 or 2012, defendant sat on Mr. Peterson and fractured his ribs on his left side. Although he was in pain, he did not seek medical attention because he "had been told that in the case of a cracked rib, there isn't a whole lot they can do about it."

Mr. Peterson estimated he spoke with police officers or Adult Protective Service workers five times during his marriage. Defendant told him to say something along the lines of: "Well, there's no problem here. Don't bother us." Mr. Peterson did as she said because he feared retaliation from defendant. He was afraid defendant would get mad at him, yell at him, and beat him in some way.

## II.  *The Events of December 29, 2012*

On the afternoon of December 29, 2012, defendant assaulted Mr. Peterson more severely than any time before. She slapped, punched, kicked, and at one point stood on his ribs on the right side, cracking them and causing him moderate pain. She pushed him into a solid object, like a door frame or a piece of furniture, causing swelling to his right temple. She slapped him in the vicinity of 10 times, punched him on the back and chest more than a dozen times, knocked him to the floor, and kicked him at least a dozen times while he was prone. Mr. Peterson received abrasions and scratches as a result of sliding across the carpet as he was kicked. The assault lasted about an hour. At the time of the assault, he had older bruises as a result of previous assaults by defendant.

After the assault, defendant forced Mr. Peterson into the garage and locked the door. He stayed in the garage between 15 and 30 minutes before she let him back into the house. After a little while, defendant informed him they were going to Solano Avenue, and she told him to get in the car.

That evening, defendant drove to Solano Avenue with Mr. Peterson in the car. While she was driving there, defendant hit him in the face with her right arm half a dozen times. She was yelling at him while she was hitting him. She parked the car and they

4

both got out.  She locked the car and told him to stand there by the passenger door. When she left, he used his cell phone to call the police and said he needed help.  He felt pain on his face, back, and various parts of his body, mild in some places but severe in others. The police came within 10 minutes.

Mr. Peterson did not receive any of his injuries on December 29, 2012 from falling down.  Nor did he tell defendant he received the injuries from falling down.

Albany Police Officer Peter O'Connor and his partner  were dispatched to the 1600 block of Solano Avenue in Berkeley at 7:25 p.m. to investigate the call.  Officer O'Connor saw an elderly gentleman (later identified as Arthur Peterson) hunched over a car.  While another officer was speaking to Mr. Peterson, defendant arrived and asked what was going on.  Then she turned to Mr. Peterson and said she told him to stay in the car.  O'Connor asked Mr. Peterson if he was injured, but he initially declined medical treatment.  However, O'Connor observed Mr. Peterson had bruising or dried blood on his lips, a raised bump on his forehead and, when he lifted his shirt, extensive bruising on his back.  At that point, O'Connor summoned the Berkeley Fire Department for assistance.

Mr. Peterson was transported by ambulance to the hospital.  Brian Hinrichsen, a physician's assistant, treated Mr. Peterson in the emergency room on December 29, 2012.  Mr. Peterson looked frail, and he was blind, but coherent.  He had dried blood on his nose and mouth, a cut on one ear, and both ears had thick scarring known as "cauliflower ears" which is often a sign of repetitive trauma.  He also had abrasions and red marks on both shoulders and back, marks on his legs, skin trauma to his right temple, and complained of severe chest pain in his right rib cage.

Mr. Peterson had five or six injuries on his thighs  and both old and fresh injuries on his arms.  His legs were red, swollen, and bruised, and the left leg was infected with a large wound like an ulcer with fluid coming out of it.  The injuries on his legs were

5

consistent with being kicked or punched or stepped on but not consistent with one fall from a standing position to the ground.

Mr. Peterson reported to Hinrichsen that he had been regularly punched and kicked by his wife for years and was hit dozens of times on December 29, 2012. A chest X-ray showed multiple rib fractures on his right and left sides. The rib fractures on the right side, where Mr. Peterson complained of pain, looked more recent. The exam was consistent with wounds in multiple stages of healing, old and probably new rib fractures, and infection of the left lower leg with a large open wound.

Richmond Police Officer Jonathan Wycinsky arrived on the scene after the other officers and detained defendant for questioning. He asked her if she had assaulted her husband, and she said no. He asked her if her husband had any medical problems that would account for the bruising on his back, and she said no, although she mentioned he had a leg infection. She said he had no mental problems, but she had seen him eating out of the garbage can and had caught him saying things that did not make sense. Defendant said she and her husband went to Berkeley to eat dinner. She parked the car in front of the restaurant. Mr. Peterson said he wanted to make a couple of calls, so she went into the restaurant by herself. Defendant told Wycinsky she thought her husband was calling the police because he was getting older, or because he made bad choices on the telephone, and that Richmond police were coming to her house all the time for no reason.

Officer Wycinsky spoke to Mr. Peterson in the hospital at approximately 9:30 p.m. on the evening of December 29, 2012. He observed Mr. Peterson had multiple injuries, including a large bruise on his forehead, a bruise on his right arm, a large abrasion on his right shoulder, dried blood on his lips, dried blood coming out of his ears, a very large leg wound, and cauliflowered ears. Mr. Peterson told Officer Wycinsky that his wife had a way of manipulating the medical staff as to the cause of his problems and that he stayed

6

quiet. Asked why defendant assaulted him that day, he said she always assaulted him. She got mad at him and beat him when he asked for food. [2]

Later that evening, Richmond Police Officer Andrew Fonseca arrested defendant at her home and took her to the Richmond Police Department where she waived her *Miranda* rights and was questioned by Fonseca. (*Miranda v. Arizona* (1966) 384 U.S. 436.) Defendant said she did not know how her husband had gotten his injuries, but he said he had fallen. She had noticed blood on him when she awoke that morning. That evening, defendant drove herself and her husband to Solano Avenue to eat at a restaurant, but when they got there, Mr. Peterson decided he did not want to eat and said he did not want to get out of the car right away, so she went inside the restaurant by herself. When Mr. Peterson did not come into the restaurant, defendant called his cell phone but he did not respond.

Defendant denied ever hitting Mr. Peterson. Asked why he was so skinny, defendant said, "I try to feed him as much as I can," and that he ate two to three times daily on average. Defendant told Fonseca "that she feared this may be Mr. Peterson's way of getting her out of his life because there was . . . some million-dollar trust that he . . . believes she may have spent or taken, and this was his way of getting . . . back at her." She also said Mr. Peterson's brother had written him threatening letters and she feared he may be the person injuring him. [3]

---

[2] At trial, Mr. Peterson did not recall what he told Officer Wycinsky about why he never spoke up about his injuries, but he testified he supposed it may have been a fear of verbal or physical retaliation from defendant if he said too much.

[3] At trial, Mr. Peterson testified he had a stepbrother he saw infrequently with whom he did not have a good relationship. However, the stepbrother had never assaulted him. His stepbrother had made "totally bogus" claims that their father's trust, of which Mr. Peterson used to be trustee, was worth a million dollars. Mr. Peterson had no knowledge about the status of the trust since his removal as trustee in 2011, but he never believed defendant "had spent even a dime of [it]."

Cecelia Zelaya cleaned the Petersons' house regularly. She was at the house cleaning on June 29, 2011, when she heard defendant yell at Mr. Peterson, "Get out of here, go away" and, "This is not your house. This doesn't belong to you." Zelaya saw defendant push him outside to the backyard through a door from the office to the yard. Mr. Peterson remained outside in the backyard during the two hours Zelaya was in the house cleaning. While she was there, Mr. Peterson tried to get back inside through the door, but it was locked. Zelaya did not open the door for him because defendant did not permit it.

Previously, Zelaya had seen defendant put Mr. Peterson outside four or five times when it was very cold. Sometimes, Mr. Peterson was left outside wearing only a shirt and shorts, without socks or a jacket. Once, after June 29, 2011, Zelaya offered Mr. Peterson a seat but defendant prevented him from sitting. Zelaya twice witnessed defendant prevent Mr. Peterson from opening the refrigerator to get food out.

The defense rested without presenting any evidence.

## DISCUSSION

Defendant's sole contention on appeal is that her trial attorney "rendered ineffective assistance of counsel under *Strickland* [*v. Washington* (1984) 466 U.S. 668] by failing to object to the argumentative and highly pro-prosecution description of five alleged uncharged allegations of abuse of [Mr. Peterson] inserted by the court in CALCRIM No.'s 852 and 853 . . . ." She argues the failure to object was prejudicial because it undercut defense counsel's closing argument that Mr. Peterson was a poor historian of facts, he had numerous opportunities to report the alleged abuse over several years and never did so, and credible evidence to corroborate his testimony was lacking. We reject defendant's claim of ineffective assistance of counsel because we find neither derelict performance nor prejudice.

8

*I. Factual Background*

Prior to trial, the prosecution sought to introduce evidence of several uncharged instances of domestic abuse that preceded the events of December 29, 2012, pursuant to section 1109.[4] Defense counsel objected on relevance and section 352 grounds. The court excluded two of the instances. During the jury instruction conference, the court and counsel discussed CALCRIM No. 852, which applies section 1109 to evidence of uncharged domestic violence, and CALCRIM No. 853, which applies section 1109 to evidence of uncharged elder or dependent-person abuse.

Both pattern instructions permit the jury to infer from evidence of prior uncharged acts of abuse that the defendant has a propensity to commit abuse, and to further infer that the defendant committed the charged crimes. Both pattern instructions direct the trial court to specify the evidence to which the jury is to apply the instruction. Thus, the pattern instruction for CALCRIM No. 852 states, in relevant part: "The People *presented evidence* that the defendant committed domestic violence that was not charged in this case[, specifically: <insert other domestic violence alleged>.]" (Italics added.) By requiring specificity, the pattern instruction provides guidance to the jury, promotes clarity, and avoids jury confusion. Lacking specificity, the jury is left to its own devices to determine which evidence it should consider under the instruction.

After specifying the uncharged acts and defining the relevant terms (such as "domestic violence" and "abuse"), the instruction continues: "You may consider this

---

[4] Section 1109 provides, in relevant part: "(a)(1) Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352. [¶] (2) Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving abuse of an elder or dependent person, evidence of the defendant's commission of other abuse of an elder or dependent person is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

9

evidence *only* if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence.  Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.  [¶ ] If the People have not met this burden of proof, *you must disregard this evidence entirely*.  [¶] If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit [and did commit] *<insert charged offense[s] involving domestic violence>*, as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of *<insert charged offense[s] involving domestic violence>*. The People must still prove (the/each) (charge/ [and] allegation) beyond a reasonable doubt.  [¶] [Do not consider this evidence for any other purpose [except for the limited purpose of *<insert other permitted purpose, e.g., determining the defendant's credibility>*].]"[5] (First and second italics added.)

Here, the court proposed language to identify prior uncharged instances of abuse about which evidence had been presented.  The court noted defense counsel's continuing objection to the evidence and to the instructions as a whole, and inquired if counsel had any specific objection to the proposed wording.  Defense counsel replied:  "As far as the wording, I'll submit the issue."

Consequently, the jury was instructed as follows:  "The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically:  [¶] *June 29th, 2011 in Richmond, California, the defendant pushed*

---

[5]  The cognate parts of pattern instruction CALCRIM No. 853 (elder or dependent person abuse) uses identical structure and wording as CALCRIM No. 852.

10

*Arthur Peterson out the rear office room to the backyard and locked him outside;* [¶] *Fall of 2012 in Richmond, California, the defendant locked Arthur Peterson out of the house to stay in the backyard at night to sleep without any clothes and in cold weather;* [¶] *During the last four years of marriage, defendant has punched and kicked Arthur Peterson multiple times in the head, chest, and along the ribs area at times causing multiple abrasions and various bruises throughout his upper and lower extremities;* [¶] *On a regular basis, the defendant deprives Arthur Peterson of food;* [¶] *From the time he became blind in 2009, defendant keeps Arthur Peterson from seeing a [sic] ophthalmologist to determine the cause of the blindness.* [¶] Domestic violence means abuse committed against an adult who is a spouse. [¶] Abuse means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it's more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit abuse of [an] elder likely to produce great bodily harm, inflicting injury on a spouse resulting in a traumatic condition, and assault by force likely to produce great bodily injury as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of abuse of [an] elder likely to produce great bodily harm, inflicting

11

injury on spouse resulting in traumatic condition, and assault by force likely to produce great bodily injury. The People must still prove each charge beyond a reasonable doubt."

The court then instructed the jury with CALCRIM No. 853 on evidence of uncharged acts of abuse against an elder. The instruction referenced the same uncharged prior acts as those referenced in CALCRIM No. 852 and was otherwise identical to CALCRIM No. 852 except that it defined elder abuse.

## II. *Ineffective Assistance of Counsel Claim*

Under state law, "[t]o prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93, citing *Strickland v. Washington, supra,* 466 U.S. at pp. 687-688, 693-694 (*Strickland*).) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*People v. Hart* (1999) 20 Cal.4th 546, 624 (*Hart*).) The rule is the same under federal law. "To establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.' " (*Premo v. Moore* (2011) 562 U.S.___ [131 S.Ct. 733, 739]; citing *Knowles v. Mirzayance* (2009) 556 U.S. 111, 122 (*Knowles*).)

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington*, *supra,* 466 U.S. at p. 697.)

### III. Analysis

Defendant argues her attorney should have objected below to the language devised by the court to describe the five alleged uncharged incidents of domestic violence as "argumentative and highly slanted in favor of the prosecution rather than neutral in nature . . . ." In her opening brief, defendant points to defense exhibits admitted at trial that contradicted Mr. Peterson's testimony about several of the alleged uncharged offenses. However, she did not suggest a more neutral or non-argumentative wording for the allegations. In her reply brief, defendant argues that instead of stating positively the incident occurred (i.e. "defendant pushed Arthur Peterson out . . .") the court could have said "*it is alleged* defendant pushed Arthur Peterson out . . . ." She argues her trial attorney should have proposed the "it is alleged" language or some other wording "that avoided the language that [defendant] committed each of the alleged uncharged acts of domestic violence or elder abuse outlined in these instructions." We note defendant does not challenge the admission of the prior uncharged offense evidence under section 1109, or the correctness of the instructions as statements of existing law. Essentially, defendant argues that, absent a change in the wording of the descriptions of the prior uncharged acts of abuse, the instructions may have made it "much more likely" that the jury would believe defendant did commit the uncharged acts of abuse. We disagree.

We determine the correctness of the challenged instruction "in the context of the instructions as a whole and the trial record," and not " 'in artificial isolation.' " (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.) Here, the preamble to the specific examples of domestic or elder abuse made it clear the examples given reflected evidence *presented* – not proven – of uncharged allegations. The balance of the instruction informed the jury it could consider the evidence only if the People proved by a preponderance of the evidence that the defendant in fact committed the uncharged acts of abuse. Furthermore, if the People did not meet this burden of proof, the jury was instructed it must disregard this evidence entirely. In our view, the instruction as a whole made it clear that, despite

13

the positive wording, the descriptions of the abusive acts were no more than allegations unless proven to the jury's satisfaction by a preponderance of the evidence. The instruction, as given, was not misleading or confusing about the nature of the allegations or the burden of proof. Under these circumstances, defendant has not demonstrated how stating "it is alleged defendant [did something] to Arthur Peterson" or similar wording would have influenced the outcome of the trial. In our view, defense counsel's failure to propose modifications to an otherwise clear and correct instruction does not constitute deficient performance.

Moreover, defendant has not shown prejudice from trial counsel's failure to propose more neutral wording. The evidence against defendant, if believed, was strong. Mr. Peterson's testimony about the events of December 29, 2012 was substantially corroborated by the police officers and medical personnel who documented the extent of his fresh injuries, the existence of previous injuries, and contradicted defendant's explanation that defendant fell and caused his own injuries. The housekeeper corroborated Mr. Peterson's testimony that defendant – not his stepbrother – put him outdoors and kept him there. There is no reasonable probability the trial would have resulted in a more favorable outcome if defense counsel had proposed changes to the wording of CALCRIM Nos. 852 and 853. No ineffective assistance of counsel appears.

## DISPOSITION

The judgment is affirmed.

14

_____
Dondero, J.

We concur:


_____
Margulies, Acting P.J.


_____
Banke, J.