Filed 9/23/16  P. v. Baez CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


**THE PEOPLE,**

>**Plaintiff and Respondent,**

>v.

**JOSE ULISES BAEZ,**

>**Defendant and Appellant.**
_____/

**A143071**

**(Solano County
Super. Ct. No. FCR299886)**

A jury convicted appellant Jose Ulises Baez of continuous sexual abuse of a child under age 14 (Pen. Code, § 288.5, subd. (a) (Count 3)),[1] lewd and lascivious conduct with a child under 14 (§ 288, subd. (a) (Count 4)), and lewd and lascivious conduct with a child under 14 by a person at least 10 years older than the child (§ 288, subd. (c)(1) (Count 5)).  The trial court sentenced Baez to the upper term on Count 3, for a total of 18 years and 8 months in state prison.

Baez appeals.  He contends: (1) his convictions must be reversed because he was denied the right to counsel during closing argument; (2) Count 4 should be reversed for lack of venue jurisdiction; and (3) the court abused its discretion by imposing the upper term on Count 3.

We affirm.

---

[1]     All undesignated statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

We provide an overview of the factual and procedural background, and more detail in the discussion of Baez's specific claims.

The People charged Baez with two counts of oral copulation or sexual penetration of K.H., a child 10 or younger (§ 288.7, subd. (b) (Counts 1 & 2), continuous sexual abuse of K.H., a child under 14 years (§ 288.5, subd. (a) (Count 3)), lewd and lascivious conduct with C.S., a child under 14 (§ 288, subd. (a) (Count 4)), and lewd and lascivious conduct with C.S., a child under 14 by a person at least 10 years older than the child (§ 288, subd. (c)(1) (Count 5)).  The complaint alleged the crimes occurred in Solano County.  Baez waived the preliminary hearing and was held to answer the charges.

*Prosecution Evidence*

A.      Baez Sexually Abuses K.H.

From approximately 2004 to 2013, Jennifer H. was in a dating relationship with Baez, and they lived together.  Jennifer had a child with Baez.  She had two other children — including K.H. — from another relationship.  Baez sometimes criticized Jennifer for not putting "enough limits" on the children.  Baez coached K.H.'s soccer team from when she was 8 until 13.  On several occasions, K.H. told Jennifer she did not want Baez to coach her, and Jennifer eventually moved K.H. to another soccer team.  Baez always found "a way to massage" K.H.'s neck and shoulders, which were sore from playing soccer.

In April 2013, Jennifer was out of town with friends when she received a "strange" text message from K.H., then 14.  K.H. told her mother she "found something in her room" and was "scared."  Jennifer called K.H., who said she could not talk because Baez was home.  Instead, K.H. sent her mother a "very lengthy and detailed" text message explaining she had found a video camera in her room.  K.H. told her mother Baez had hidden the camera in a blanket and had "tried to watch" her.

2

Jennifer returned home and asked K.H. why she was upset, what she thought the camera was for, and whether Baez had "ever done anything to" her.[2] K.H. responded, "'Yes, he had.'" When Jennifer asked, "'What did he do to you?'" K.H. said Baez came into "her room on a regular basis and touch[ed] her inappropriately, put his mouth on her inappropriately, and he had been doing this for a very long time." K.H. said Baez "would rub on her" and he showed her his penis and asked "if she wanted to touch it." A few times, Baez tried to penetrate K.H. with his fingers, but she "roll[ed] over" and he stopped. As K.H. was talking to her mother, Baez came home. The conversation stopped and K.H. went to a friend's house.

After K.H. left, Jennifer confronted Baez. Baez admitted setting up the camera, but did not tell her why. Instead, he tried to show Jennifer a picture on his cell phone, and claimed K.H. was upset with him because he had not taken her to a soccer game that morning. When Jennifer asked "specifically" about the sexual abuse K.H. described, Baez "just chang[ed] the subject" and said "he didn't have anything to tell" Jennifer. Baez also claimed K.H. was lying. Upset and overwhelmed, Jennifer left the house. A friend drove K.H. to the police station. K.H. told the friend that Baez had been touching her "on her vagina" several times a week over "three or four years[.]" Jennifer met K.H. at the police station, where they spoke to law enforcement officers about the abuse.

Jennifer ended her relationship with Baez and obtained a protective order against him. After K.H. reported the abuse, Jennifer thought about Baez's previous behavior, and concluded it was "unusual." For example, K.H. locked her door at night, claiming her younger half-brother was "get[ting] into her things." The door had a pin so it could be unlocked from the outside. One evening, Jennifer heard the pin in K.H.'s door "pop, the sound of the door opening." Jennifer went into the hallway and noticed K.H.'s door

---

[2]    On cross-examination, Jennifer acknowledged the possibility that she said, "'I bet he'll say it was to capture what time you came home'" when K.H. told Jennifer about the camera. Jennifer denied having disagreements with Baez about the lack of "limits" Jennifer placed on K.H. When asked whether Baez said he put the camera in K.H.'s room to "capture what time [K.H.] got home[,]" Jennifer responded, "[t]hat could be" and "yes."

3

was shut. Jennifer opened the door and saw K.H.'s "TV was on and [Baez] came . . . quickly to the doorway and the look on his face, he just looked guilty[,] . . . 100 percent caught." Baez claimed he came into K.H.'s room to turn off the television, but Jennifer wondered why he had to shut the door before turning off the TV. Additionally, Jennifer found tubes of KY Jelly "all around" the house, including in K.H.'s room. The KY Jelly did not belong to Jennifer, and she had never seen K.H. buy it. Finally, K.H. told Jennifer she did not like Baez, and did not want Jennifer to marry him. Jennifer thought K.H. felt that way because Baez "wasn't warm and fuzzy" — Jennifer did not have any "idea what he was doing" to K.H.

B.     K.H.'s Trial Testimony

Baez began touching K.H. when she was in fifth grade. Several times a week, Baez touched her when she got home from school, before Jennifer returned home. He followed K.H. around the house and touched her butt. Baez would also lay K.H. down on the bed in the master bedroom, take her pants and underwear off, and touch her vagina. He rubbed and licked her vagina. "A lot" of times, Baez put his fingers inside her vagina for a "slight second." It was "uncomfortable" and K.H. moved her body away from Baez. Once, Baez asked K.H. to touch his penis; he guided her hand toward it, and helped her stroke it. Baez also put his penis inside K.H. "a little bit."

When K.H. entered middle school, Baez began abusing K.H. in her room at night, two or three times a week. K.H. locked her bedroom door because she did not want Baez to come into her room; she thought what he was doing was "scary." Baez, however, popped the door lock open, came into her room, reached "his hand under [the] covers and grab[bed]" her leg. K.H. "wanted him to stop" so she pushed his hand away, but Baez did not stop. Sometimes Baez removed K.H.'s pajamas and underwear, and touched and tried to penetrate her vagina. Other times, he touched her without removing her clothes. Baez used a lubricant similar to Vaseline.

On an April 2013 evening, K.H. discovered a camera hidden in a blanket in her bedroom. She saw it was recording, and had been for two hours. She stopped the recording and watched the video: she saw Baez setting up the camera in her room and

4

trying to hide it so K.H. "couldn't see it[.]"[3] K.H. deleted the recording, replaced the camera, and texted her mom. Then K.H. went to sleep. When she woke, her mother was home and the camera was gone. Then Baez returned home and K.H. went to a friend's house because she did not want to be present when Jennifer confronted Baez.

K.H. was walking in the neighborhood, telling her friend "what happened over the years." As they walked, Jennifer drove up, "crying really, really hard." K.H. got into the car, and Jennifer asked: "'You swear you wouldn't make this up?'" K.H. responded, "'No. I wouldn't put our family through something like that.'" Jennifer and K.H. went to Jennifer's friend's house and then to the police station. K.H. did not initially tell her mother about the abuse because she did not understand it was wrong; later, when K.H. was older, she did not report the abuse because she did not want to hurt her mother.

On cross-examination, K.H. stated she might have asked Baez for a massage, or to crack her back, when she was sore after soccer practice. She sometimes felt "friendly and playful" toward Baez and, on occasion, sat on his lap.

C.    Police Investigation of Baez's Sexual Abuse of K.H.

Vacaville Police Officer Matt Adame interviewed K.H, who described discovering the video camera and the sexual abuse. The abuse began when K.H. was about 10 years old. Baez pulled K.H.'s pants down, licked her vagina, and penetrated her vagina with his finger. This hurt K.H., and she asked him to stop. When K.H. "got older[,]" Baez abused her at night. It hurt when Baez put his fingers inside K.H.'s vagina; she noticed a difference when he used lubricant. Two or three times, Baez tried to have sexual intercourse with K.H., assuring her she was too young to get pregnant. K.H. estimated Baez sexually molested her 100 times.

Police arrested Baez. From jail, Baez called Jennifer. During one telephone conversation, Jennifer said, "'why don't you just admit what you have done'" and Baez responded, "'I did. I did it, Jenn. I did it.'" Baez also wrote letters to K.H.'s

---

[3]    The police retrieved the deleted video and the prosecution played it for the jury.

5

grandmother, quoting Bible verses and stating he had "'no one to blame'" but himself and that he was "'sorry . . . for . . . all of this.'"

D.    Baez Sexually Abuses C.S.

When C.S. was in seventh, eighth, and ninth grades, she played soccer on a team coached by Baez. When C.S. was in seventh grade, she had a cell phone. Baez called her, telling her she was "beautiful" and "sexy" and asking her what she was wearing. Many times, Baez called late at night, at "midnight or 1:00 a.m." When she was in eighth grade, Baez texted C.S., asking her to meet him at a park in the middle of the night, and telling her he loved her. C.S. did not respond to the texts sent in the middle of the night. Eventually, C.S. told Baez to stop texting, "'I love you'" and he agreed.[4]

In August 2011, when C.S. was 13, she and her soccer team traveled to San Luis Obispo to play in a tournament. The team, parents, and coaches — including Baez — stayed at a hotel. One evening, Baez, C.S., and other players were in the pool; Baez was throwing them from one end of the pool to the other. Baez threw C.S. and, when she was swimming, reached "his hand down [her] bathing suit bottoms and . . . rubbed her" vagina. C.S. did not make eye contact with Baez and did not speak to him. She immediately got out of the pool.

Baez sexually abused C.S. a second time in January or February 2012, when she was 14. At an evening soccer practice, Baez asked C.S. to get balls out of a trailer on the field. C.S. went inside the trailer. The lights were off. Baez pushed C.S. against the wall of the trailer, kissed her neck, and put his hands down her pants. C.S. "kneed . . . or punched" Baez and walked out of the trailer. C.S. sat on the bench for the rest of the practice, and did not play soccer with the team again. Some time later, Baez texted C.S. to ask her why she was not attending practice. C.S. responded that she was studying for

---

[4]    Baez called another player on the team, H.D., late at night, and texted her multiple times a day. When H.D. texted Baez asking what color jersey to wear in an upcoming soccer game, he responded, "'You can wear your birthday suit.'" H.D. told her mother about the texts and stopped responding.

6

finals and Baez wrote, "'now you owe me a picture.'" C.S. texted Baez a picture of her "flipping him off" and he responded, "'Nice. Now sit on it.'"

C.S. did not report the abuse because she did not think anyone would believe her. After K.H. reported the abuse, C.S. spoke with a police officer. She told the officer Baez grabbed her butt over her bathing suit in the pool, and that he touched her vagina over her jeans in the soccer trailer. At trial, C.S. acknowledged she lied to the police. C.S. lied because her mother was present during the police interview and C.S. did not want her mother to know what had happened. C.S. asked her mother not to attend the trial because C.S. "didn't want [her] to know" what Baez did.

C.S. told her best friend things she did not tell her parents. In December 2012, C.S. told her best friend Baez "molested her" two times: he touched her vagina in a San Luis Obispo pool and it "made her feel really uncomfortable" and he pushed her up against a wall inside a trailer during a soccer practice and kissed her neck. C.S. seemed "really scared and helpless" — like "[s]he didn't know what to do" — when she related this information to her friend.

*Defense Evidence*

Several witnesses, including Baez's relatives, testified they did not think Baez was the type of person to molest a child. Baez's sister-in-law testified K.H. was "playful" with Baez and sat on his lap. She thought C.S. was also "playful" and seemed to want "attention" from Baez. Baez's two sons lived with Jennifer and Baez, and they did not see Baez doing anything inappropriate to K.S. Several relatives testified K.S. was manipulative and not always truthful.

*Verdict and Sentence*

The jury convicted Baez of Counts 3, 4, and 5. The jury could not reach a verdict on Counts 1 and 2 and the court dismissed them. The court sentenced Baez to a total of 18 years and 8 months in state prison, comprised of the 16-year upper term on Count 3, a consecutive two-year term on Count 4, and a consecutive eight-month term on Count 5.

7

DISCUSSION

I.

*Restricting Defense Counsel's Closing Argument Was*
*Not an Abuse of Discretion*

Baez contends his convictions must be reversed because he "was denied his Sixth Amendment right to counsel" during closing argument. According to Baez, the court prohibited his attorney from arguing "direct" and "favorable" evidence — Baez's supposed reason for putting the video camera in K.H.'s room.

A.      Defense Counsel's Closing Argument

Defense counsel argued Baez "does need to defen[d] himself because of the video camera. He doesn't deny that he put the video camera in her room. What [he] says is, 'I put it there because I wanted . . . .'" The prosecutor objected; at a bench conference, defense counsel argued there was testimony to support her claim. The court asked counsel, "From Jennifer H[.] to one of the police officers about what Jennifer said?" and the prosecutor responded, "[w]hat the defendant said is not testimony." The court sustained the objection.

Defense counsel returned to the subject, telling the jury that when Baez wrote a letter blaming himself, he was "saying . . . I am sorry that I put that video camera there, and I started off this chain of events." The prosecutor objected "[t]here is no evidence of that" and the court sustained the objection. At a bench conference, the court asked defense counsel to rephrase her comment, to "say it a different way." Counsel did so, arguing, "It's a reasonable interpretation of the evidence that Mr. Baez is claiming and being sorry for all this. What he meant was, I blame myself for having put that video camera there and having this turn into the whole thing, the court proceeding and people having to testify. [¶] You'll see one of the things he says to [K.H.'s grandmother], . . . 'I'm sorry I bothered you' . . . Basically he is embarrassed that he did this with the video camera, and now —"

The prosecutor objected "There is no testimony" and the court overruled the objection, noting counsel's argument was a "[r]easonable interpretation" of the evidence.

8

Defense counsel continued, "It's a reasonable interpretation of the evidence that he said those things because he feels bad about having put the video camera there and starting this whole chain of events. [¶] . . . You may not agree that it is a good idea for someone to put a video camera in their stepdaughter's room to record what time [she is] coming home, but this case is not about whether or not you would agree with Mr. Baez'[s] parenting style."

Defense counsel also argued Baez was "upset because he feels that Jennifer H[.] is not imposing enough limits on [K.H.'s] behavior. Jennifer goes away for the weekend. According to [K.H.], she goes over to her friend's house. She doesn't tell Mr. Baez where she is going. He is concerned. He wants to show Jennifer H[.] what her daughter is up to. [¶] He decides to put this video camera in her room in order to record what time she comes home. [¶] Again, that you may not agree that is a good parenting style, but that doesn't mean beyond a reasonable doubt that he molested anyone. He puts the video camera, and again, I'm saying this is a reasonable interpretation of the evidence. He puts the video camera on the dresser because he doesn't want [K.H.] to know that he is recording what time she comes home, and he needs a flat surface to do that and something that is pointing at the door. [¶] So he puts the camera on the dresser, not because he wants to see her undress —" The prosecutor objected and the court sustained the objection.

Undeterred, defense counsel continued: "[K.H.] comes home. She sees the video. She erases it. [¶] Mr. Baez retrieved the video cam sometime during the night. He doesn't try to molest her even though no other adults were home. [¶] The next morning [K.H.] talks to Mr. Baez about going to the soccer game . . . He leaves without her. She is angry. . . ." Defense counsel argued it was a reasonable interpretation of the evidence that K.H. falsely accused Baez of molestation because he left for the soccer game without her or "he was trying to impose more discipline on her or have Jennifer impose more discipline on her, or she is upset about the video cam[era]." Defense counsel returned to the video camera just before concluding closing argument, noting Baez explained "why he put the video camera there" and that he showed Jennifer the picture on his phone.

B.     Argument Regarding the Court's Restriction on Closing Argument

Outside the presence of the jury, defense counsel "strenuously" objected to "not being able to capture [K.H.'s] time coming home. There was defense testimony about that." The court explained, "[t]he issue is and the way you were saying it, the defendant does this, . . . and it was the way that you were just describing it, that thinking process, and there was never testimony about his thinking process." Defense counsel responded, "But there was testimony that came out that . . . he was [ ] trying to capture what time she came home." The court replied: "I think I let you bring that out, but the way you were saying this, and thinking this, and the way you were describing your objective, there was no testimony on that."

The court noted "some of the information came through, and you were able, and I permitted you, to argue that to the jury and you did make that reference to the jury, and then you made reasonable interpretations. So that is closing argument. [¶] People are permitted to argue the reasonable inferences from the evidence, and so I believe that you were able to achieve that objective. You got that issue out in front of the jury, and that you weren't prevented from doing so. [¶] So yes, there were objections. I sustained some. I overruled some. It is what it is." Defense counsel responded: "I think my problem with that, there is an objection, no facts in evidence, and the Court sustained the objection. It is like saying to the jury, there was no evidence that he put the video there in order to capture the time she was coming home, and in fact, there was." The court responded, "I don't believe that is actually how the transcript unfolds. I think it was the manner in which you were saying, the defendant thought this, and the defendant said this, and there was no evidence of that. The defendant did not testify, and people can't testify as to what was in his mind or what was his intent when he did that, whereas in the event there is a reasonable interpretation as to his intent is a whole different story."

C.     Restricting Closing Argument Was Not an Abuse of Discretion

"A criminal defendant has a well-established constitutional right to have counsel present closing argument to the trier of fact. [Citation.] '[The] right is not unbounded, however; the trial court retains discretion to impose reasonable time limits and to ensure

10

that argument does not stray unduly from the mark.' [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 110; *People v. Gonzales* (2011) 51 Cal.4th 894, 956 (*Gonzales*).) A trial court may preclude argument regarding facts not in evidence or with respect to conclusions that cannot be reasonably inferred from the evidence. (See *People v. Boyette* (2002) 29 Cal.4th 381, 463-464.)

Here, the court did not abuse its discretion by restricting defense counsel's closing argument. (*Gonzales, supra,* 51 Cal.4th at p. 956.) Defense counsel discussed the video camera at great length during summation, repeatedly arguing Baez installed the camera to capture what time K.H. came home at night and suggesting K.H. manufactured the sexual abuse allegations. The court sustained three objections to defense counsel's closing argument, but the court did not prevent counsel from advancing the defense theory of the case.[5] The minor restriction on defense counsel's closing argument was not an abuse of discretion. (*People v. Benavides, supra,* 35 Cal.4th at p. 110). Having reached this result, we need not consider the Attorney General's harmless error argument.

II.

*Baez's Venue Claim Fails*

Baez argues Count 4, lewd and lascivious conduct with C.S., a child under 14 (§ 288, subd. (a)), must be reversed "for lack of venue jurisdiction" because the crime occurred in San Luis Obispo County, not Solano County.

A.    The Section 784.7 Letter

The complaint alleged the crimes occurred in Solano County. Baez waived the preliminary hearing and was held to answer the charges. The prosecution began its case-in-chief on June 19, 2014. That day, a Deputy San Luis Obispo District Attorney wrote a

---

[5]    We are not persuaded by Baez's claim that his "intent in setting up the video camera" was a "key issue" in the case. During summation, defense counsel told the jury: "[y]ou may not agree" placing a hidden video camera in K.H.'s room was a good "parenting style," but that does not prove beyond a reasonable doubt "that he molested anyone." Defense counsel's argument tends to diminish the importance of the video camera. Baez was not charged with surreptitiously recording K.H.: he was charged with sexually abusing K.H. and C.S. (§§ 288, subd. (a), 288.5, subd. (a)).

11

letter agreeing the incident occurring "in San Luis Obispo County shall be prosecuted in Solano County" pursuant to section 784.7 (the letter).

The prosecution concluded its case on June 25, 2014. At the end of the day, the prosecutor noted Count 4 was the incident in "the swimming pool in San Luis Obispo." According to the prosecutor, there was jurisdiction pursuant to section 784.7 "based upon the other sexual offenses in this county." The prosecutor offered the letter and the court suggested marking it as an exhibit. The court noted section 784.7 applies "when there is more than one offense involving a person, they agree to let another jurisdiction play through." Then the prosecutor responded, "Right, I informed [defense counsel]." The prosecution said she would tell the jury Count 4 was the San Luis Obispo incident.

Defense counsel said she "skimmed that letter. I didn't realize it was going to be submitted to the jury. . . . That's . . . a legal issue." The court responded, "Right. That is why I said a Court exhibit just for our record to make sure. And we [are] all in agreement, I know I have been focusing in, but we really need to get some clarity from [the prosecutor] about exactly which count goes to which event, and I feel like I have that clear now." Defense counsel did not respond.

B.     Baez Forfeited His Complaint Regarding Lack of Venue, and Venue In Solano County Was Proper

"[S]ection 777 provides that when a crime is committed within a particular county, venue lies in that county. [Citation.]" (*People v. Aleem* (2006) 144 Cal.App.4th 1155, 1157, fn. omitted (*Aleem*).) Section 784.7, however, "expands venue for specified offenses to permit crimes involving the same defendant and the same victim that occurred in different counties to be tried in the same county." (*People v. Betts* (2005) 34 Cal.4th 1039, 1059.) Under section 784.7 when more than one violation of specified sex offenses "occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing, pursuant to Section 954, within the jurisdiction of the proposed trial. At the Section 954 hearing, the prosecution shall present evidence in writing that all district attorneys in counties with jurisdiction of the

12

offenses agree to the venue. Charged offenses from jurisdictions where there is no written agreement from the district attorney shall be returned to that jurisdiction." (§ 784.7, subd. (a).)

"A defendant's right to be tried in a venue authorized by statute is a right subject to waiver by the defendant." (*Aleem, supra,* 144 Cal.App.4th at p. 1160, fn. 9.) "[T]aking into account the nature and purpose of the venue safeguard and the substantial state interest in protecting the integrity of the process from improper 'sandbagging' by a defendant, . . . a defendant who fails to raise a timely objection to venue in a felony proceeding forfeits the right to object to venue—either at trial or on appeal." (*People v. Simon* (2001) 25 Cal.4th 1082, 1104; *Aleem, supra*, at p. 1160, fn. 9.) Here, defense counsel did not object to venue before trial, nor when the prosecutor introduced the letter and argued venue for all offenses was proper in Solano County pursuant to section 784.7. As a result, Baez's complaint regarding lack of venue jurisdiction — including his claim that "section 784.7 jurisdiction cannot attach" because the court did not hold the required section 954 hearing — is forfeited.

In any event, Solano County was the appropriate venue for Count 4, notwithstanding the court's failure to hold a formal section 954 hearing. Section 954 authorized the joinder of the charges. (See *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1112, 1113 [joinder under section 784.7, subdivision (a) is "allowed only if section 954 permits joinder of the charges" and "section 954 permits joinder of sex crimes"].) There is no evidence in the record suggesting the court would have exercised its discretion under section 954 to deny joinder had the court held a formal section 954 hearing. (*People v. Nguyen, supra,* at p. 1114 [at a section 954 hearing, the court may exercise discretion to deny joinder "'in the interests of justice and for good cause shown'"].) The San Luis Obispo District Attorney agreed Count 4 should be prosecuted in Solano County, and consolidating the offenses for trial promoted the purpose of section 784.7: to spare C.S. from "'having to testify in multiple trials in different

13

counties.'" (*Aleem, supra,* 144 Cal.App.4th at p. 1159, quoting *People v. Betts*, *supra*, 34 Cal.4th at p. 1059 & fn. 15.) Baez's venue claim fails.[6]

## III.

### *Imposing the Upper Term on Count 3 Was Not an Abuse of Discretion*

Baez claims the court abused its discretion in imposing the upper term for Count 3, continuous sexual abuse of K.H., a child under 14 years (§ 288.5, subd. (a)). At sentencing the court determined the upper term was "appropriate" and noted K.H. was "very credible" and the "shame belong[ed]" to Baez. The court listed "multiple aggravating factors," including "the extremely young tender age of . . . K.[H.]. The position of trust that [Baez] held for both of these victims, and numerous, numerous acts of sexual abuse that were testified to over a lengthy period of time, way more than what the elements of the crime requires [for sending] people to prison. [¶] I think it would be easy to characterize them as voluminous. The high term is the appropriate term in this case, 16 years."

Trial courts have wide discretion in weighing aggravating and mitigating factors when making sentencing decisions. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582.) The trial court may rely on any aggravating circumstances reasonably related to its sentencing decision (Cal. Rules of Court, rule 4.420(b)), and a single valid aggravating factor justifies the upper term. (*People v. Black* (2007) 41 Cal.4th 799, 815, overruled on another ground in *Cunningham v. California* (2007) 549 U.S. 270.) However, that aggravating factor must be supported by substantial evidence, and cannot be an element of the crime itself. (*People v. Osband* (1996) 13 Cal.4th 622, 730; Cal. Rules of Court, rule 4.420(d).)

According to Baez, the court could not rely on his "position of trust" with K.H. because a position of trust is akin to residing in the same home as the minor, and is an

---

[6]    For the reasons expressed in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1056, we reject Baez's claim that he was denied his right to a jury trial on Count 4.

element of the crime. We disagree. While the crime of repeated abuse of a child under age 14 must be committed by a person "who either resides in the same home with the minor child or has recurring access to the child" (§ 288.5, subd. (a)), there is no requirement that a position of trust exists between victim and abuser. Because "continuous sexual abuse can be committed by anyone residing in the same home with the children, whether or not they have special status with the victim, such sentencing factor is not an element of the crime." (*People v. Clark* (1992) 12 Cal.App.4th 663, 666 [trial court could rely on victim's stepfather's "position of trust and confidence" to impose upper term].) Here, the court properly relied on this aggravating factor, and substantial evidence supports it. Baez held a position of trust with respect to K.H. — he was her mother's boyfriend and her soccer coach. He abused this position of trust by repeatedly sexually molesting K.H.[7]

Baez complains the court erroneously relied on K.H.'s "young tender age" when imposing the upper term. We agree. Where an age range factor is an element of the offense, vulnerability based on age is not a proper aggravating factor. (See *People v. Quinones* (1988) 202 Cal.App.3d 1154, 1159, overruled on other grounds as stated in *People v. Soto* (2011) 51 Cal.4th 229 [age (that victim be under 14) was an element of the section 288 violation and could not be used to impose the upper term].) Here, the court's invocation of this improper aggravating factor is harmless because the court relied on other valid aggravating factors. "When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper." (*People v. Price* (1991) 1 Cal.4th 324, 492.)

---

[7] The court also relied on the "voluminous" number of sexual assaults Baez committed on K.H. Substantial evidence supports this aggravating factor: K.H. testified Baez sexually molested her several times a week for several years, at least 100 times. Baez abused K.H. many more than the three times required by section 288.5. As a result, his offense was "distinctively worse than it would ordinarily have been," justifying the upper term. (*People v. Fernandez* (1990) 226 Cal.App.3d 669, 682.)

Here, it is not reasonably probable the court would have imposed the middle or low term on Count 3.

DISPOSITION

The judgment is affirmed.

_____

Jones, P.J.

We concur:


_____

Needham, J.



_____

Bruiniers, J.